**Ray R. SENCE and Tod Oviatt, Trustees of the Ray R. & Grace I. Sence Trusts**

v.

**The UNITED STATES.**

No. 106–64.

United States Court of Claims.

May 10, 1968.

---

Carl A. Stutsman, Jr., Los Angeles, Cal., attorney of record, and Jack R. White, Los Angeles, Cal., for plaintiffs. Hill, Farrer & Burrill, Los Angeles, Cal., of counsel.

Richard A. Gadbois, Jr., J. Patrick Whaley, Los Angeles, Cal., for Musick, Peeler & Garrett, Los Angeles, Cal., amicus curiae. Miller & Chevalier, Los Angeles, Cal., of counsel.

Joseph Kovner, Washington, D.C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D.C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:*

In 1953, 19 Declarations of Trust were executed by Ray R. Sence and his

---

* On "The Depletion Question" and "The Charitable Deduction Issue" this opinion incorporates, without change, the opinion of Trial Commissioner Saul Richard Gamer. (The defendant did not except to the commissioner's adverse recommendation on the latter issue.) On "The Multiple Trust Question", we use, with only the slightest modification, the commissioner's statement of the facts and his discussion of the settlor's purpose. With respect to the ultimate legal issue of whether the trusts should be taxed as one or separately, we come to the same result as the commissioner but on a narrower ground, and we do not reach or discuss the broader point on which he rests his recommendation.

wife Grace, their grandson being the primary income beneficiary of each of them. Sence and Virginia R. Oviatt, the Sences' daughter, were named as co-trustees in all of the trusts. For the trusts' fiscal years ending October 31, 1958, 1959, and 1960, seven of the 19 had sufficient income to require the filing of an income tax return, and the trustees filed such a return for each of the seven. However, the Commissioner of Internal Revenue asserted deficiencies with respect to these seven returns in the total amount of $498,812.77. The trustees have paid such sum, plus interest in the amount of $114,964.82, and here sue (there having been a substitution of one of the original trustees) for the refund of such payments totaling $613,777.59, plus interest thereon.

The dispute between the parties involves three separate questions, which will be individually treated.

### The Multiple Trust Question

■ Defendant contends that, for Federal income tax purposes, the 19 trusts should, since they effectuate impermissible income splitting, be consolidated and taxed as one. Plaintiffs argue that the individual trusts were created in good faith for nonincome tax purposes and are entitled to treatment as separate tax entities.

Except for one trust which consisted only of mineral rights on neighboring property, the trusts, created in August and September 1953, consisted of portions of a ranch owned by the settlors, together with the mineral rights incident thereto.[1] This ranch of over 1,300 acres is located near the town of Somis, in Ventura County, California, and is therefore referred to as the Somis Ranch. It is situated near the top of South Mountain. This mountain is near the western end of a range in certain portions of which it had long been known that oil of economically productive quantity and grade existed. The entire area is known by geologists and the industry as the Ventura Oil Basin. One of these oil areas, discovered in 1916, was on top of South Mountain, and was known as the South Mountain Oil Field. The entire range constituted an anticline, a geological formation considered to be favorable for oil accumulation. Three other fields existed to the east of the South Mountain field.

After World War II ended, oil-drilling activity increased in the California oil fields. Additional exploration succeeded in gradually extending the South Mountain field from the top of the mountain down its sides. The Somis Ranch, close to the top, lay in the path of this extension. In 1949, Sence [2] leased a portion of the ranch for oil exploration, and by 1952 the Shell Oil Company had successfully developed several producing wells on the property. This lease covered 160 acres in the northern part of the ranch.

However, the South Mountain Oil Field area is a highly faulted one (i. e., fractures exist in the earth strata). In such a faulted area as the South Mountain one, oil occurs in small domal structures or fault traps of approximately one square mile dimension. It is extremely difficult to predict the location of such domal structures. Furthermore, the South Mountain field is composed of so-called lenticular oil sands. Such fields normally have a high oil, low water content at their center, and low oil, high water content, at their ends. As of the end of 1952, the two most southerly wells on the Somis Ranch property covered by the Shell lease had less oil-bearing sands than those farther north and were not considered good producers. There were no other oil wells on the ranch south of the Shell wells but there

---

1. Of the 18 trusts covering real estate, five consisted of land which did not include any mineral rights, six consisted of land with one-half of the mineral rights, and seven consisted of land with full mineral rights (finding 21).

2. Although the property was in the names of both Mr. and Mrs. Sence, Mr. Sence will sometimes be referred to as the taxpayer and property owner.

were more southerly wells on adjoining properties, and the producing well thereon nearest to the southern border of the Shell-Sence lease also had a high water, low oil, content. These factors indicated to Shell, as well as to some other oil companies, that, at least so far as the Somis Ranch was concerned, the South Mountain Oil Field did not economically extend southward below the border of the geological structures covered by the Shell lease, their feeling being that the water table was being approached at such border. Sence had, prior to 1953, unsuccessfully attempted to interest several oil companies in other portions of his ranch.

However, the intensified exploration of the California oil fields that had commenced after the war continued without abatement, reaching its peak in 1954. The years 1953 and 1954 were the most active ones for drilling unexplored, unproved, acreage, and Shell too made plans to drill several new wells as part of its overall South Mountain Oil Field development program. Despite its considering the two most southerly wells on its Sence lease as poor producers, Shell planned three more wells on the southern portion of the lease that would be slightly south of such two wells, as well as 13 more wells on two leases it had on adjoining properties on which there were already a large number of producing wells. These 13 new wells would, if successful, constitute a slight southern extension of the field.

Furthermore, other oil companies during this period were not as conservative as Shell in exploring further down the sides of South Mountain. On the properties directly adjoining the Sence Ranch on the west, the Union Oil Company owned a lease south of the two Shell leases which, in 1952, it made plans to develop. It commenced drilling on such leased property in February 1953 and in April successfully brought in a producing well, the most southerly one in the area. It then began drilling another well on such leased property at approximately the same southerly line but to the east and near the adjoining Shell-Sence lease, forcing Shell to drill an "offsetting" well,[3] and constituting Shell's most southerly well on the Sence property. Both new Union and Shell wells turned out to be producers.

In the midst of this activity, the Humble Oil and Refining Company appeared on the South Mountain scene. It had first entered the west coast area in 1947 and was thereafter extremely active in attempting to discover new crude oil sources to support its new west coast retail marketing operations, assuming, in this exploration activity, risks that some other oil companies considered unwarranted. In early 1953, it commenced making an intensive geological investigation of the South Mountain area including, with Sence's permission, the Somis Ranch.

It was during this time that Sence first considered creating the trusts. The Sences were wealthy and in their sixties, and had one daughter, and one grandson, age eight. Sence felt he should engage in some estate planning. He wanted to provide an income for his wife and daughter, and to provide for the future of his grandson. After consulting with an attorney who was in general practice, but who was not unacquainted with tax law, and with an accountant who was an expert in estate planning, including the tax aspects thereof, Sence decided, insofar as the overall plan concerned the grandson, to place all of his interests in the Somis Ranch (except for the 160 acres under lease to Shell) in trust for his grandson,[4] any income to be accumulated and paid out during his adulthood (but with the trust principal being available at any time for his support, if necessary). He decided to accomplish this,

---

3. A well drilled as a protection against a well on adjacent property draining off all the oil from the underground pool.

4. As to his wife and daughter, Sence decided to place certain of his income-producing assets in trust for their lives.

however, by creating a number of trusts and conveying to each trust only a portion of the ranch. Thus, taking the approximately 1,309 acres comprising the ranch, less the 160 under lease to Shell, the remaining 1,149 would be broken up into 30 sections of approximately 40 acres each, with each section to be conveyed to a separate trust. For ease in effecting the breaking up of the ranch into such 40-acre divisions, it was decided simply to follow the grid lines separating the quarter-quarter sections (each such section comprising approximately 40 acres) on the state survey map.

In accordance with this agreed-upon plan, Sence's attorney began drafting the trusts in April 1953, the first one being dated April 20, 1953. By May 11, 1953, he had drafted 19 of them.

At about this time, Humble offered to lease a portion of the Somis Ranch property lying in the southwestern part of the ranch and upon which Sence's neighbor, Bianchi, held one-half of the oil rights. The proposed lease also covered some of Bianchi's property upon which Sence held one-half of the oil rights. Humble presented to Sence and Bianchi an oil and gas lease dated June 1, 1953, for their execution. The lease covered some of the Somis Ranch parcels which Sence's attorney had already included in the 19 trusts he had drafted, but Humble, of course, was unaware of the as yet unexecuted Sence trust plan. However, evidently at least by May 7, 1953, as a result of negotiations or otherwise, Sence and his attorney knew of the coverage of the proposed lease because the corpus of one of the 19 trusts the attorney prepared at that time, i. e., the one dated May 7, 1953, consisted only of the oil rights that Sence owned on the Bianchi property and covered no portion of the Somis Ranch.

After the tender by Humble, Sence submitted the proposed Humble lease to his attorney for review, and the further drafting of additional Declarations of Trust, for unexplained reasons, apparently ceased (in all probability, however,

to await agreement upon the Humble lease and a determination of the part the proposed trusts would have to play in connection therewith). Meanwhile, the execution of the Humble lease was postponed, presumably to await the completion of the details incident to the creation of the trusts that would have to be parties to the lease.

In early August, the attorney sent to Sence for execution and notarization the seven trusts (six covering Somis Ranch parcels and the seventh covering the Bianchi oil rights), which were involved in the proposed Humble lease. These seven trusts were all executed and duly notarized on August 7, 1953, and recorded at the county registry on August 12, 1953. Thus, these were the first trusts created (i. e., those dated April 20, and 24, and May 1, 5, 6, 7, and 11, 1953).

In September 1953, Sence's attorney made certain suggestions concerning the proposed Humble lease, and also gave instructions concerning its execution by the seven trusts. In that month also the remaining 12 trusts were all executed, notarized, and recorded, four being executed on September 18 and recorded on September 22, 1953, and eight being executed on September 23 and recorded on September 25, 1953.

Thereafter, the Humble lease was changed to reflect the ownership of the property interests covered thereby in the trusts, and the lease, still dated as of June 1, 1953, was finally executed by the trustees of the seven trusts on December 23, 1953 (after having been executed by the Bianchi interests on November 25, 1953). The lease was for two years and provided that the seven trusts would receive a one-sixth royalty interest in any oil produced.

In their important aspects, all the trusts were substantially the same. The grandson was the principal beneficiary of each, each had the same trustees (Sence and his daughter) and each imposed almost identical duties upon the trustees. Except for the one trust consisting only of the oil rights, the corpus

of each, irrevocably conveyed, was approximately 40 acres, or a quarter-quarter section, of the ranch property, together with all interests of the settlors (oil rights, if any) incident to the particular 40 acres. The only variations consisted of the date of the distribution of the income to the principal beneficiary, the designation of a minor income beneficiary,[5] and the powers of the trustees with respect to investments.

At about this time, Sence decided, for reasons not made clear by the record, to discontinue the creation of any further trusts. Thus, of the approximately 30 trusts originally contemplated for complete division of the ranch, only the above described 19 were actually created so that, except for the contiguous trust parcels of the seven trusts which were parties to the Humble lease, the trust parcels are scattered throughout the ranch, and Sence still owns approximately half of the ranch.

Although no oil was found by Humble on the property covered by the June 1, 1953 lease, under a second lease (and operating agreement) with Humble executed in 1955 by seven of the other trusts (as well as by the Sences individually, the ranch properties covered by the second lease consisting of both trust and nontrust parcels), several producing wells were successfully brought in, and it is the trust income derived from this second Humble lease (and operating agreement) which gives rise to the dispute herein. Plaintiffs, as trustees of such trusts, filed separate fiduciary income tax returns for the seven trusts, but deficiencies were assessed by the Commissioner of Internal Revenue on the basis of all the trusts constituting only one entity for tax purposes.

Since a trust is a separate tax-paying entity, entitled to its own exemption,[6] it is obvious that, where there is income-producing property to be placed in trust, it would, solely from an income tax point of view, be advantageous to place it in several trusts instead of just one. In this way, many taxpaying entities would be created, each paying the lower tax applicable to its portion of the split income, as well as being entitled to its own exemption, instead of one entity paying the higher tax applicable to the entire income, and with only one exemption. See Note, Multiple Trusts and the Minimization of Federal Taxes, 40 Colum.L.Rev. 309 (1940).

However, plaintiffs deny that income splitting was the motivation for the creation of the multiple trusts. They contend that the settlors were not even thinking of possible imminent oil income when the trusts were created and that their creation was instead legitimately related only to long range real estate subdivision plans of a wholly nontax nature. The contention is that, while the ranch property at the time the trusts were created in 1953 was of little value as real estate, the settlors contemplated that in 20–30 years, when the grandson would be an adult, the great population growth of California in general and Ventura County in particular would in all probability cause the ranch to be in demand for subdivision purposes. It was reasonably contemplated, it is argued, that at that time relatively small 40-acre parcels, or even lesser parts thereof, would be more readily salable for subdivision development purposes than a large 1,200-acre tract. And, although small pieces of a large tract could, it is true, be sold off in the future at the appropriate time just as well

---

5. The Masonic Homes of California was such beneficiary in five of the trusts, the National Red Cross in five, the Burbank Girl Scouts in five, and the YMCA in four. These charities were entitled to receive from one to five percent of the trust income, the amounts varying from trust to trust.

6. Section 641(b) of the Internal Revenue Code of 1954, 26 U.S.C. § 641(b) (1964), provides that "the taxable income of an estate or trust shall be computed in the same manner as in the case of an individual." The section further provides that "the tax shall be computed on such taxable income and shall be paid by the fiduciary."

from one trust, it is explained that, under the California laws as they existed in 1953, and as plaintiffs allegedly reasonably construed them, the ranch could then be broken up into parcels down to 40 acres without the necessity of complying with various burdensome requirements otherwise relating to subdivision development. Therefore, plaintiffs allege, the settlors decided to avail themselves then of such favorable situation, instead of running the risk of burdensome requirements being imposed some time in the future and which might handicap the trustees in effecting sales. The trustees would then, according to the plan, invest the proceeds of the future property sales in order to provide a life income for the grandson who, as an adult, would then be able to handle it.[7]

This attempt to divest the creation of the trusts from the oil aspects of the situation must be rejected. As the recited facts demonstrate, the idea of the multiple trusts was conceived at the height of oil exploration activity on the ranch as well as on the neighboring South Mountain Oil Field properties. At that very time Humble was actively investigating the ranch. Sence was naturally and understandably oil minded. Oil had already been discovered on his ranch and was being profitably exploited by Shell. He had attempted to interest other companies in other portions of his ranch. The trend of the South Mountain Oil Field development was down the flanks of the mountain in the direction of his ranch properties. Oil had just recently been discovered on neighboring property geographically below the southern border of the Shell lease on his ranch. The Humble lease of June 1, 1953, was tendered prior to the creation of any of the trusts in August and September 1953,[8] so that when the trusts were created, Humble's interest in the property was known. Indeed, the six trusts whose ranch properties were covered by the proposed Humble lease, plus the one trust consisting only of the one-half interest in the oil rights on the Bianchi property, were, although not consecutively prepared and dated, taken out of order and were the first seven created, all being executed and notarized on August 7, 1953, and recorded on August 12, 1953. The Humble lease then had to be revised to reflect the change in the ownership of the trust properties from Sence to the seven trusts. Certainly, under these circumstances the contention that Sence was not thinking of oil or possible oil income at the time he created the multiple trusts cannot be accepted.

Furthermore, on this record it is extremely difficult to accept the alleged real estate considerations as constituting the motivation for the creation of the multiple trusts.

What we are here concerned with is, of course, the intent of the settlor and what he had in mind in establishing the trusts. However, the testimony of Sence concerning his reasons for creating the multiple trusts and the purpose

---

7. Under the California Subdivision Map Act (Calif.Bus. & Prof.Code § 11000 et seq.), one who divides his property into five or more parcels for purposes of sale would be required to submit to the Ventura County Planning Department for approval a tentative map indicating thereon proposed road alignments, lot locations, zoning, and other similar details. One exception to the filing provisions of the act is where the land division is of not less than 160 acres, if such land is under Federal survey. Plaintiffs say that the settlors interpreted these provisions to permit first dividing up the ranch into 160-acre parcels, and then further dividing each 160-acre parcel four more times into 40-acre parcels, all without being required to comply with the Map Act filing provisions. Furthermore, under their interpretation, the trustees, when it came time to make sales from each 40-acre parcel, could make four sales therefrom, again without having to comply with the act.

8. Plaintiffs erroneously refer to the creation of the trusts as taking place in April and May, which would be prior to the tender of the June 1 lease. The trusts were not actually executed, notarized, and recorded, until August and September 1953.

he intended they would serve is most unsatisfactory. Indeed he could give no satisfactory or plausible reason. About all he said was that he acted on his attorney's advice.[9] Insofar as it relates to future subdivision possibilities, it is unacceptably vague and indefinite.[10] Substantially all the testimony about the future subdivision basis for the creation of the trusts came instead from Sence's attorney and related to the advice he gave Sence.[11]

Nor is this alleged nontax reason plausible. The ranch consists of rough, mountainous country. It would be most difficult to develop. Only a hardy optimist could believe that this ranch would be attractive for subdivision development even in 20–30 years. Eighty percent of the ranch has a slope in excess of 25 percent. Some of the steeper portions contain slopes in excess of 40 to 50 percent. It is extremely difficult to develop land having a slope in excess of 20 percent, the development of land with a 25 percent slope being considered economically unfeasible. Highways and utilities are located at a great distance from the ranch. The ranch could not sustain more than one house to the acre. The normal developer prefers to place around five houses on an acre. Furthermore, below the range of mountains of which South Mountain is a part lies the undeveloped relatively flat terrain of the Las Posas Valley containing 10,000 acres of virtually undeveloped land which could support over 135,000 people. This valley would almost certainly be developed prior to any development near the top of the mountain. The record makes plain that no development of the Somis Ranch would be reasonably foreseeable until about the year 2000.

One would think that if real estate subdivision considerations were significant in the settlor's mind, he would at least have obtained some expert advice on the matter. However, no evaluation or appraisal of the ranch as real estate or subdivision development property was ever obtained from anyone. Nor was the property divided in any meaningful way so far as real estate development is concerned. The 40-acre trust parcels were simply created by the attorney's following the quarter-quarter section grid lines on an official map, irrespective of contours or geographical features that would normally control subdivision areas. Indeed, the very nature of this rough, mountainous property would necessitate a developer's having a broad choice in selecting locations. For this reason, a subdivider would require, from an economic standpoint, from 200 to 500 acres for proper subdivision, and not the arbitrary 40-acre grid line divisions the attorney made. This was not the kind of property that reduction to 40-acre

9. "Q. By Mr. Shaiman: Now, can you tell us, Mr. Sence, why you set up these trusts?
"A. Well, as you probably know by now, I have quite a number of interests in different things. I certainly never enter into any of these deals without getting good legal advice and studying it, and whichever then from that point on that we think is the best is the way we move.
"So, I went in with my attorney on this for several times.
"Q. Who was that attorney, by the way?
"A. Bob Himrod. And then, from that point on, we decided that it would be good to set up these trusts, and that's what we did." (Sence Dep. pp. 24–25.)

10. In Sence's entire testimony, "subdivision" is mentioned only once, as follows:

"Q. Is there any specific reason why you set up the trusts in the fashion that they were set up? Did you discuss this with Mr. Himrod?
"A. I think not any more than what I have explained with you. So, after discussing it, all the details can't come back to me, what we went into. We thought it would be a good idea for subdivision in the future, and it would be all set apart. That was one thing." (Sence Dep., p. 27.)

11. It was agreed at the trial that insofar as the attorney's testimony referred to statements made by Sence, such testimony would constitute hearsay and would not be admissible to establish the truth of Sence's alleged statements. (Transcript, pp. 27, 32.)

parcels would serve to facilitate sales to subdividers. And finally the creation of the trust of May 7, 1953, consisting only of Sence's one-half interest in the oil rights on the Bianchi property could not possibly have had any basis in real estate subdivision considerations.[12]

In support of the contention that the splitting of prospective oil income was not the motivating factor for the creation of the trusts, plaintiffs point to the interest displayed by Sence in the fall of 1955—some two years after the trusts were created and while he was negotiating with Humble for the second lease (and the operating agreement)—to terminate the trusts, which would have resulted in the consolidation of all the income in his own hands. However, the motivation behind the seeming desire to undo the trusts and recapture the property is insufficiently explained by the record, and, further, Sence never in fact took any steps to revoke the trusts. In any event, it is the settlor's intent at the time the trusts were created that is important, not the second thoughts he may have had two years later. Furthermore, the desire to recapture the property, which would have made all the income taxable to Sence himself, raises essentially different problems than those involved in the question of whether, there

admittedly having been a divestment, such divestment should be treated as being in one or 19 parts. For the same reason, insofar as the consolidation issue is concerned, the underlying reason offered for the creation of the trusts, i. e., to take the ranch property (except the 160 acres then under lease to Shell) out of the Sence estate while it was still of relatively low value, is irrelevant, for the property could just as well be conveyed and removed from the estate by one conveyance as well as by multiple conveyances. The issue is not the basic right of the Sences to give away their property. Consolidation of the trusts into one for tax purposes will not affect that right at all and will leave this purpose for the establishment of the trusts undisturbed.

For all the above reasons, the alleged nontax real estate subdivision basis for the creation of the multiple trusts is so implausible that it cannot be accepted.[13] On this record, the conclusion must be that the possibility of currently imminent oil income, not distantly future real estate subdivision, was the basic underlying reason for the creation of the multiple trusts.

This being so, the Government urges, and the trial commissioner held, that the trusts must be treated as one because

---

12. Nor does the fact that there was also conveyed to five of the trusts ranch property upon which the Sences owned no oil rights negative the oil basis for the creation of the trusts because income-reporting techniques would make it possible for such non-oil-rights trusts to share in the oil income of the oil-rights trusts anyway. Under the income-reporting arrangement that was actually adopted for the trusts when oil income was realized, all the trust parties to the lease (and operating agreement) divided the oil income according to the ratio of acreage held by a particular trust bore to the total acreage of the seven trusts, regardless of the location of the wells earning the income.

13. Defendant further attacks the validity of the legal justification given for breaking up the ranch into 40-acre parcels without the necessity for compliance with

the Map Act. Defendant says that, if the breaking up was done with real estate subdivision really in mind, then the settlors would have been required to comply with the filing provisions of the Map Act in accordance with what it regards are the act's requirements. However, this is a technical matter of state law insufficiently developed on this record. Furthermore, a conclusion that the attorney's opinion was erroneous would not necessarily affect the bona fide nature of his belief. It is true, however, that it would be most surprising if the opinion expressed by plaintiff's attorney were valid because by first bringing down a large tract to 160 acres, and then by the constant application of the four-four rule in further dividing up the property, the Map Act could be completely subverted. Moreover, in the instant case, there was never any prior actual division of the property into 160-acre parcels.

tax avoidance was the reason for the creation of separate trusts. Plaintiffs, on the other hand, contend that even a clear tax avoidance motivation cannot transform individual trusts into one consolidated trust for tax purposes; all that is required for separate taxation, they say, is that separate trusts be actually created. We do not reach or consider the issue of whether separate trusts can be established for a tax avoidance purpose because, in our view, plaintiffs have failed to fulfill the necessary prerequisite to the application of the general standard they proclaim. Even if we assume that an undisputed tax avoidance motivation would be irrelevant, the taxpayer would still have to show that he did in fact establish and maintain separate trusts before he could avail himself of the privilege of separate taxation. In this respect plaintiffs have failed. They did not sufficiently maintain the trusts as separate and distinct entities.

The blurring of the lines among the various trusts, as well as between the trusts (on the one hand) and Mr. Sence's personal ownership (on the other), is revealed by our findings. In a number of ways the trusts were treated as one, and in other ways the trust properties were treated as if still owned by Mr. Sence. Although some income was earned by seven of the trusts in 1953 and 1954 (under the Humble lease), books of account for the separate trusts were not set up until October 1956. One checking account and two savings accounts were established for all the trusts, called the "South Mountain Account", and there was apparently no indication that these were trust accounts; checks drawn on the account were signed by Mr. Sence (who personally controlled the account) without any notation that he was signing as trustee or that the account was a trust one. Mr. Sence also deposited some of his personal funds in this account. The income from the Humble agreements was all deposited in the account and the amounts entered in each trust's books were calculated on the basis of the ratio of the acreage held by that trust to the total acreage under the Humble contracts—regardless of the location of the income-producing wells and without any proof of a pooling arrangement.

Similarly, Mr. Sence did not keep his own interests completely apart from those of the trusts. We have already pointed out that he deposited personal funds in the "South Mountain Account". He invested trust funds in a type of investment prohibited by the trust instruments. He distributed trust funds to charities not named as beneficiaries in the trusts and in percentages not specified; the named charities were never informed that they had an interest in the trusts' annual income; and the charitable payments were by check on the "South Mountain Account" which did not reflect that a trust was the source of the payment but instead made it appear as a personal contribution of Mr. Sence. He continued to graze his cattle on property conveyed to the trusts although not paying any grazing fees to the trusts for the use of the land. From 1953 to 1965, county property taxes on property owned by the trusts were assessed to the Sences, individually, without complaint by them; during some of this period the taxes were paid by the Sences personally, and for other periods out of the "South Mountain Account". The trust books showed money received by the trusts as a receivable from Sence, not as a cash asset of the trust itself.

■■ We catalog these facts, not to show that the trusts were "unreal" or "sham" or "paper trusts" in the sense that title to the real estate never passed from Sence to the individual trusts, but rather to show that Sence did not adequately maintain the trusts as separate from each other and from himself. If it is permissible to create separate trusts solely for tax avoidance reasons (which, as stated above, we do not decide), then it is appropriate to require a taxpayer to turn square corners—to dot his i's and cross his t's (if that metaphor is preferred)—in order to take advantage

of the rule. Transactions between family members "calculated to reduce family taxes should always be subjected to special scrutiny."

Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 291, 66 S.Ct. 532, 537, 90 L.Ed. 670 (1946). See, also, Helvering v. Clifford, 309 U.S. 331, 335–337, 60 S.Ct. 554, 84 L.Ed. 788 (1940). As applied here, that principle means that the taxpayer with tax avoidance motivation must affirmatively show that he created and maintained truly separate trusts before he can claim that they should be taxed individually and not as one. In that respect plaintiffs have fallen down. Cf. Boyce v. United States, 190 F.Supp. 950, 957 (W.D.La.), aff'd per curiam, 296 F.2d 731 (5th Cir. 1961). "When a taxpayer thus boldly proclaims that his intent, at least in part, in attempting to create a trust is to evade taxes, the court should examine the forms used by him for the accomplishment of his purpose with particular care; and, if his ingenuity fails at any point, the court should not lend him its aid by resolving doubts in his favor." Morsman v. Commissioner of Internal Revenue, 90 F.2d 18, 22, 113 A.L.R. 441 (8th Cir.), cert. denied, 302 U.S. 701, 58 S.Ct. 20, 82 L.Ed. 542 (1937).

Accordingly for income tax purposes, all these substantially identical trusts created, as part of a family arrangement, primarily for the benefit of the same beneficiary should be treated as consolidated into one and the tax computed on the basis of their consolidated incomes and with only one exemption.

### The Depletion Question

■ The second oil lease and the operating agreement with Humble hereinabove mentioned were both entered into on November 30, 1955. The agreements were executed by Humble, the trustees (Sence and his daughter) on behalf of seven of the trusts, and Sence and his wife as individuals (with respect to portions of the ranch retained by them). The two instruments were part of an overall arrangement. The Sences would not have entered into one without the other. Sence, for himself and on behalf of the seven trusts, was not interested in a lease only, but insisted also on participating in investing in the development of the property through an operating agreement, and, in return, in the sharing of a portion of the hoped-for operating profits. Negotiations concerning the lease and operating agreement had taken place since September 1955, Sence, his attorney, and an oil lease expert retained by Sence, all taking part therein, but with the expert doing most of the direct negotiating with Humble on behalf of the Sences and the trusts.

Under the lease the lessors each leased to Humble the land they owned (which was south of the Shell lease and east of the first Humble lease) for five years and so long thereafter as oil (or gas or other hydrocarbon substances) were produced in paying quantities. The rental royalty was 26 percent of the net proceeds from the sale of oil produced from the leased property. Under the operating agreement, which related to the same real property covered by the lease, the Sences and the seven trusts agreed to share 25 percent of Humble's expenses in return for 25 percent of Humble's profits from the sale of oil. The Sences and the seven trusts under each agreement were to share the income in proportion to the amount of acreage each owned to the total acreage under the lease. The operating agreement further provided that Humble (designated as the "Operator") and the lessors under the simultaneously executed lease (designated as the "Non-Operators") agreed to share jointly in the expenses of developing the property covered by the lease and to jointly own the products therefrom and all property and equipment placed thereon on the basis of 75 percent for Humble and 25 percent for the lessors. The agreement further provided that although the entire leasehold estate had been vested in Humble, Humble held for the Sences and the seven trusts an undivided 25 percent interest in the leasehold estate, the Sences and the sev-

en trusts owning such undivided 25 percent interest in proportion to the amount of acreage each owns to the total acreage under the lease.

In computing the deductions for depletion in connection with reporting the gross income of each of the seven trusts in each of the three years herein involved, the trusts aggregated the income received under the lease and that received under the operating agreement to determine the total gross income for the purpose of computing the statutory limitations on depletion.

With respect to the years in issue (1958 to 1960, inclusive), sections 611

and 613(a) and (b) of the Internal Revenue Code of 1954 permit a taxpayer to deduct by percentage depletion 27½ percent of the gross income from the property which may not, however, exceed 50 percent of the taxable income from the property.[14]

However, the Commissioner disallowed the claimed right to aggregate income from the lease and operating agreement for the purpose of computing the depletion limitation. The result of this disallowance was a reduction of the trusts' deductions for depletion.[15] The disallowance was in accordance with a specific provision of Treasury Regulation § 1.-

14. Said sections provide in part:
"§ 611. *Allowance of deduction for depletion.*

"(a) *General rule.* In the case of mines, oil and gas wells * * * there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion * * * to be made under regulations prescribed by the Secretary * * *.

"§ 613. *Percentage depletion.*

"(a) *General rule.* In the case of mines, wells, and other natural deposits listed in subsection (b), the allowance for

depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property * * *. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion) * * *.

"(b) *Percentage depletion rates.* The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

"(1) 27½ percent—oil and gas wells. * * *"

15. For instance, with respect to the trust of April 23, 1953, the adjusted depletion allowance for the taxable year ended October 31, 1958, was computed as follows:

"Royalty interest depletion:
  (a) 27½% of 45,890.56, gross income _____ $12,619.70
  (b) 50% of 44,860.39 net income before depletion _____ $22,430.20
  Lesser of (a) or (b) _____ $12,619.90
Operating mineral interest depletion:
  (a) 27½% of $32,662.05, gross income _____ $8,982.06
  (b) 50% of 475.30, net income before depletion _____ 237.65
  Lesser of (a) or (b) _____ 237.65
      Total depletion _____ $12,857.55"

On the aggregate basis, the total gross income would be $78,552.61 (45,890.56 + 32,662.05), 27½ percent of which would be $21,601.97. The total net income would be $45,335.69 (44,860.39 + 475.30), 50 percent of which would be $22,667.85. The $21,601.97 figure, being the lesser one, would be applicable. Thus, the depletion allowance resulting from the aggregation would be $21,601.97, instead of $12,857.55, making a difference of $8,744.42 for this one year on this one trust.

On the aggregated basis, the sharp effect of the low net income on the operating interest (due to the expenses involved in the operation) is diluted when added to the high net income on the royalty interest (on which there is little expense), making the total 50 percent limitation figure much higher.

614–2(b) stating that: "A taxpayer may not aggregate operating mineral interests and nonoperating mineral interests such as royalty interests." (26 C. F.R. § 1.614–2(b).)

Plaintiffs first contend that, while the 1954 Code admittedly does draw distinctions between operating and nonoperating (or royalty) interests, there is nothing in the Code which specifically prevents, in computing depletion, combining the income from such separate interests in the same parcel or tract of land and that the regulation, which serves to deny to taxpayers a right not expressly denied to them by the Code, is invalid. They point out that Regulation § 1.611–1(b) (26 C.F.R.), issued under section 611 of the Code, the basic section allowing a depletion deduction for oil and gas wells, provides that such "deductions are allowed only to the owner of an economic interest in mineral deposits" and that "An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place * * * and secures, by any form of legal relationship, income derived from the extraction of the mineral * * *, to which he must look for a return of his capital." Further, section 613(a) of the Code provides that the depletion allowance shall be a percentage of the gross income "from the property", the word "property" being defined in section 614(a) as "each separate interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land", with Regulation § 1.614–1(a) (2) issued

thereunder again defining "interest" as "an economic interest in a mineral deposit."

Under these definitions, plaintiffs argue that, since both the lease and the operating agreement resulted from a package deal and a single investment from which they looked to production for a return of their capital, they in effect owned only one "economic interest", and not "separate" ones, despite the fact that two agreements were involved in securing such interest. Since Regulation § 1.611–1(b) allows depletion to the holder of an interest from which income is derived "by any form of legal relationship", it is immaterial, they say, whether such single interest is derived from one agreement or two. The income from this single interest is therefore entitled, they contend, to be aggregated as income "from the property" under section 613(a) of the Code.

This contention cannot be accepted, it presumes that, in the "package deal" circumstances such as are here involved, the 1954 Code permitted the aggregation of income from an operating and a nonoperating interest. The Code, however, cannot be so interpreted.

It is true that the Code did not specifically prevent the aggregation of nonoperating and operating interests. It is plain, however, that, as enacted, there were entirely separate provisions specifying special rules for the aggregation of operating interests (68A Stat. 210, § 614 (b) (1954)) and for the aggregation of nonoperating (or royalty) interests (68A Stat. 210, § 614(c) (1954),[16] (as there

---

16. "SEC. 614. DEFINITION OF PROPERTY.

"(a) *General Rule.*—For the purpose of computing the depletion allowance in case of mines, wells, and other natural deposits, the term 'property' means each separate interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land.

"(b) *Special Rule as to Operating Mineral Interests.*

"(1) *Election to Aggregate Separate Interests.*

"If a taxpayer owns two or more separate operating mineral interests which constitute part or all of an operating

unit, he may elect (for all purposes of this subtitle)—

"(A) to form one aggregation of, and to treat as one property, any two or more of such interests; and

"(B) to treat as a separate property each such interest which he does not elect to include within the aggregation referred to in subparagraph (A).

"For purposes of the preceding sentence, separate operating mineral interests which constitute part or all of an operating unit may be aggregated whether

still are).[17] It would hardly be logical to conclude that although Congress laid down meticulously in separate sections, in an orderly statutory scheme, provisions concerning the aggregation only of the same kinds of interests, i. e., either operating or nonoperating, without making any similar provision for the aggregation of such dissimilar interests, Congress nevertheless meant to permit the aggregation of such dissimilar interests. Even the aggregation of similar interests was hedged in by conditions and limitations. Certainly the conclusion is compelled that the lack of any provisions permitting the aggregation of such dissimilar interests indicates an intention to prevent such aggregation.

Nor, in view of the definition of "property" which is subject to the depletion allowance as "each separate interest owned by the taxpayer in each mineral deposit in each separate tract", is the fact that the separate and different royalty and operating interests were *obtained* in a package deal of any significance. Even though they were bar-

gained for together, there were two separate and different interests created by two separate agreements, one, the "operating mineral interests" as defined by section 614(b), involving "costs of production", and the other, the "Nonoperating mineral interests" as defined by section 614(c), and under the statute each "separate interest" was entitled to its own depletion allowance. The regulation definitions of "interest" as "an economic interest" in no way serves to alter this conclusion. While in a broad sense it may be said that the taxpayer here had only one "economic interest" in one "property", i. e., his ultimate interest was only in the oil on his property, nevertheless, as defined by the statute and regulations, he had two "economic interests", one arising out of the royalty agreement, and the other arising out of the operating agreement.

That Congress, despite the absence in the statute of a specific prohibition against aggregating the dissimilar operating and nonoperating interests, did not intend to permit such aggregation is

---

or not they are included in a single tract or parcel of land and whether or not they are included in contiguous tracts or parcels. A taxpayer may not elect to form more than one aggregation of operating mineral interests within any one operating unit.

"(2) *Manner and Scope of Election* * * *.

"(3) *Operating Mineral Interest Defined.*—For purposes of this subsection, the term 'operating mineral interest' includes only an interest in respect of which the costs of production of the mineral are required to be taken into account by the taxpayer for purposes of computing the 50 percent limitation provided for in section 613 * * *.

"(c) *Special Rule as to Nonoperating Mineral Interests.*

"(1) *Aggregation of Separate Interests.*—If a taxpayer owns two or more separate nonoperating mineral interests in a single tract or parcel of land, or in two or more contiguous tracts or parcels of land, the Secretary * * * may, on showing of undue hardship, permit the taxpayer to treat (for all purposes of this subtitle) all such mineral interests as one property. * * *

"(2) *Nonoperating Mineral Interests Defined.*—For purposes of this subsection, the term 'nonoperating mineral interests' includes only interests which are not operating mineral interests within the meaning of subsection (b) (3)."

17. 26 U.S.C. § 614 (1964 ed.). Subsection (b), entitled *Special rules as to operating mineral interests in oil and gas wells*, permits the combining of all of a taxpayer's operating mineral interests in a separate tract but forbids the combination of such interests in different tracts (subsection (d), containing the same definition of "operating mineral interests" as was set forth in § 614(b) (3) of the original statute), and subsection (e), entitled *Special rule as to nonoperating mineral interests*, permits aggregation of such interests in a single tract or adjacent tracts provided the Secretary, on a showing that "a principal purpose is not the avoidance of tax" grants permission for such aggregation (subsection (e) (2) containing the same definition of "Nonoperating mineral interests" as was set forth in § 614(c) (2) of the original statute).

made wholly plain by the legislative history of the 1954 Code provisions in question.

As it passed the House, the bill (H.R. 8300) which subsequently became the 1954 Revenue Code, provided for the aggregation of operating interests only.[18] However, the Senate added a new section to the House Bill to provide for the aggregation of nonoperating interests too, but only upon a showing of undue hardship. This section became section 614(c) of the Code. And the Report of the Senate Finance Committee with respect to this addition and explaining it, specifically stated:

> * * * Nonoperating mineral interests are defined for purposes of this subsection as interests which are not operating mineral interests within the meaning of section 614(b) (3), and thus includes royalty interests. *In no case may a nonoperating interest be aggregated with an operating interest.* * * * S.Rept. No. 1622, 83d Cong., 2d Sess., 3 U.S.C.Cong. & Adm.News (1954) pp. 4621, 4976. [Emphasis supplied.]

Thus, since section 614 of the 1954 Code treats operating and nonoperating interests differently, and since the legislative history clearly indicates that Congress did not intend that operating and nonoperating interests be treated as a single depletion unit. Treasury Regulation § 1.614–2(b) specifically prohibiting the aggregation of operating and nonoperating interests does not go beyond the statute and is valid.

Plaintiffs, however, further and alternatively contend that, in any event, section 614(d) of the 1954 Code (26 U.S.C. § 614(d) (1958) ), properly interpreted, permits taxpayers the use of the 1939 Code treatment of depletion if there were any rights under the 1939 Code which had not been provided for in the 1954 Code, and that under the 1939 Code it would have been proper to aggregate an operating and a nonoperating interest where such interests were included in a single tract or parcel.

Section 614(d) was added to the 1954 Code by section 37 of the Technical Amendments Act of 1958 (72 Stat. 1606, 1633, 1637). It reads as follows:

> (d) 1939 CODE TREATMENT WITH RESPECT TO OPERATING MINERAL INTERESTS IN CASE OF OIL AND GAS WELLS. —In the case of oil and gas wells, any taxpayer may treat any property (determined as if the Internal Revenue Code of 1939 continued to apply) as if subsections (a) and (b) had not been enacted. If any such treatment would constitute an aggregation under subsection (b), such treatment shall be taken into account in applying subsection (b) to other property of the taxpayer.

Plainly, this section limits 1939 Code treatment to operating interests. The caption specifically says so and the text refers only to subsection (a), which defines "property", and subsection (b), which refers only to operating mineral interests. It is difficult indeed to derive from this section permitting 1939 Code treatment where operating interests are concerned authority to use such Code when a nonoperating interest is involved.

However, plaintiffs contend that it is only the heading of section 614(d) that says anything about operating interests and that the text of the section is not so restricted at all. Pointing to certain

---

18. The Report of the Committee on Ways and Means stated, in discussing the section involved (614):

"The operating interests that may be combined into one property need not be included in a single tract of land or even in contiguous tracts, but they must be comprised in extractive operations which are normally or reasonably conducted as a unit. The taxpayer may not elect to form more than one aggregation of interests within any one operating unit. Royalties or similar interests which do not bear a portion of the costs of exploration, development or production are not operating interests, and may not be combined." H.Rept. No. 1337, 83d Cong., 2d Sess., 3 U.S.C. Cong. & Adm.News (1954) pp. 4017, 4085.

legislative history, they argue that Congress did not actually intend to so limit the section and that the section's "confusing heading" therefore should, in accordance with the general rule that "the plain and unambiguous meaning of the text of a Code provision cannot be extended or limited by its title or heading" (1 Mertens, Law of Federal Income Taxation § 3.19), be disregarded. Once the definition of depletable "property" as "each separate interest", set forth in section 614(a) of the 1954 Code, is disregarded, as section 614(d) authorizes taxpayers to do should they elect to come in under the 1939 Code, then, say plaintiffs, under the 1939 Code, which did not define "property" at all and which made no distinctions between operating and non-operating interests, aggregating such interests in a case such as the instant one would allegedly be proper, the pertinent regulations under such Code, simply defining "property" as an interest owned in any mineral property, also allegedly not prohibiting such aggregation in a proper case (i. e., where both interests really constitute, as plaintiffs say their two interests do, only one interest in a single parcel of land).

The contention that Congress did not intend by section 614(d) to restrict resort to the 1939 Code to operating interests only, and that the heading of the section so stating should be disregarded, cannot be accepted. Again the legislative history of the provision clearly indicates that Congress meant exactly what it said, heading and all.

The legislative history upon which plaintiffs rely is the Report of the House Committee on Ways and Means concerning the Technical Amendments Act (H.R. 8381) as it passed the House. H.R.Rept. No. 775, 85th Cong., 1st Sess. The proposed section 614(d) then read as follows:

> (d) 1939 Code Treatment: Any taxpayer may treat any property (determined as if the Internal Revenue Code of 1939 continued to apply) as if subsections (a), (b), and (c) had not been enacted. If any such treatment would constitute an aggregation under subsection (b) or (c), such treatment shall be taken into account in applying subsections (b) and (c) to other property of the taxpayer. 104 Cong.Rec. 17045.

However, the provision was substantially altered by the Senate to read as the finally enacted section 614(d), quoted above.[19] The heading was changed so as to refer only to operating interests in oil and gas wells, and the text was also coformably changed to apply only to oil and gas wells and to delete the reference to subsection (c) of the 1954 Code, which provided a "Special Rule as to Nonoperating Mineral Interests" and which permitted aggregation thereof under certain circumstances. It is thus plain that the heading is in no way inadvertent or confusing. Instead, both heading and text were amended so as to make it clear that only operating interests were covered by the section, the heading specifically saying so, and all references to nonoperating interests being deleted from the text.

In addition, the Report of the Senate Finance Committee with respect to the amended provision which was finally enacted as section 614(d) stated concerning its amendment:

> Under subsection (c) of your committee's bill, section 32 of the House

---

19. The Senate Finance Committee's Report on the bill described the House bill as adding "a new subsection to section 614 which, in effect, provided that a taxpayer may elect to treat any property as if the 1954 Code definition of property had not been enacted and as if the 1939 Code rules still applied", and then went on to state: "Your committee's bill represents a substantial amendment of the House bill insofar as it concerns the treatment of operating mineral interests in the case of mines and other natural deposits (except oil and gas) and the treatment of all nonoperating mineral interests." Senate Rept.No.1983, 85th Cong., 2d Sess., 3 U.S.C. Cong. & Adm.News (1958) pp. 4791, 4962–63.

bill has been retained as section 614(d) of the code, *insofar as it relates to the treatment of operating mineral interests in the case of oil and gas wells.* S.Rept. No. 1983, 85th Cong.2d Sess., 3 U.S.C.Cong. & Adm. News (1958) pp. 4791, 4974. [Emphasis supplied.]

And the balance of the discussion concerning the section, including the illustrative examples, refers only to operating interests.

Moreover, the Conference Report on the act further dispels any possible doubt as to the meaning of the Senate amendment:

Section 32 of the House bill amended section 614 of the 1954 Code to provide, in effect, that any taxpayer could treat any mineral property as if section 614 of the 1954 Code had not been enacted and as if the 1939 Code rules pertaining to the definition of the property continued to apply. *Senate amendment 94 limits the application of section 32 of the House bill to operating mineral interests in the case of oil and gas wells.* The amendment further provides a new set of rules which are applicable to operating mineral interests except in the case of oil and gas wells and to all nonoperating mineral interests. Conference Rept. No. 2632, 85th Cong., 2d Sess., 3 U.S. C.Cong. & Adm.News (1958) pp. 5053, 5065. [Emphasis supplied.] [20]

Thus, since section 614(d) plainly does not authorize plaintiffs' attempt to use the 1939 Code as a basis for aggregating an operating interest with a nonoperating one such as are herein involved, it is not necessary to resolve the further dispute between the parties as to whether such an aggregation would in any event have been permissible under the 1939 Code.[21]

Lloyd Corp. v. Riddell, 347 F.2d 455 (9th Cir. 1965), is the only case cited by the parties which specifically addresses itself to the issues herein involved. It holds, in agreement with the conclusions hereinabove set forth, "that under the 1954 Code operating and nonoperating interests may not be combined" and that under section 614(d), the 1939 Code could apply "only to an aggregation of operating interests" (at 458). Plaintiff insists that this decision is erroneous, and urges this court, upon a fresh consideration of the issues involved, to hold otherwise. However, upon such consid-

20. Regulation § 1.614–4(a) issued under section 614(d) specifically restricts the application of the section to operating interests providing, in pertinent part, as follows:

"In the case of oil and gas wells, a taxpayer may treat under section 614(d) and this section any property as if section 614(a) and (b) had not been enacted. For purposes of this section, the term 'property' means each separate operating mineral interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land."

21. Plaintiffs contend that limiting section 614(d) to operating interests makes it redundant, since section 614(b) already gave taxpayers the right to aggregate such interests at the time section 614 (d) was enacted. This "redundancy" argument is without merit. Section 614(d) eliminated the definition of "property" contained in section 614(a) of the 1954 Code as to those with operating interests who elected to come under the 1939 Code.

Thus, owners of operating interests who had or could have aggregated such interests under the 1939 Code and in accordance with definitions of aggregable "property" then contained in the applicable regulations and in court decisions, which definitions were alleged to be more favorable than the statutory definition contained for the first time in the 1954 Code, were permitted by section 614(d) to aggregate in accordance with the 1939 Code. Thus, insofar as "property" concepts under the 1939 Code permitted the aggregation of operating interests that would not be permitted under section 614(d), such section would be far from redundant. The mere fact that a taxpayer owned two operating interests would not automatically make them aggregable under either the 1939 or the 1954 rules. They still had to qualify for aggregation under the rules. See Note, The Property Concept in the Calculation of Percentage Depletion: The Disjunction of the 1954 Aggregations, 113 U.Pa.L.Rev. 1246 (1965).

eration, as set forth above, including those contentions made here which seemingly were not made to the Ninth Circuit, it seems clear that the holding of the *Lloyd Corp.* case is sound.

### The Charitable Deduction Issue

■ The trust instrument for each of the 19 trusts provides that its trustees must pay a certain percentage of its trust income to its specified charity within the year the income was earned. Sence, as co-trustee for each of the seven trusts having income, did not pay the proper amount of the income to the named charity as directed by each trust document but instead distributed some of the specified income to other charities. A portion of the pertinent percentage of the trust income, however, was paid to the proper specified charity. The balances owed to its charity by each trust were noted as liabilities on its books. [22]

On the tax returns for each trust for each year herein involved there was deducted the amount of net income which was distributable to the named charitable beneficiary under the terms of the Declaration of Trust whether or not that beneficiary had actually been paid. However, the Commissioner of Internal Revenue determined that those amounts not actually paid to the charity denominated in the trust document were not deductible from the trust income in computing the income tax.

Section 642(c) of the Internal Revenue Code of 1954, 26 U.S.C. § 642(c) (1964), allows an estate or trust a deduction for any amount of gross income "which pursuant to the terms of the governing instrument is, during the taxable year, paid or permanently set aside for a [charitable] purpose." Since, un-

der this provision, the amounts in dispute were concededly not "paid", the only question is whether they were "permanently set aside" for a charitable purpose within the meaning of the statute.

On this issue, the law is well settled in plaintiffs' favor. In the case of either an estate or a trust, income is deemed to be "permanently set aside" for a charity if the governing instrument makes mandatory the payment of the income to the charity during the tax year. See Commissioner of Internal Revenue v. Leon A. Beeghly Fund, 310 F.2d 756 (6th Cir. 1962); Arthur Jordan Foundation v. Commissioner of Internal Revenue, 210 F.2d 885 (7th Cir. 1954); Bowers v. Slocum, 20 F.2d 350 (2d Cir. 1927); Estate of John E. Myra, 4 T.C.M. 958 (1945); and cases cited therein. The fact that the income "was in fact used * * * for purposes other than those lawfully exempt * * * is wholly irrelevant" since by the will or trust instrument itself, "the income in dispute was ‘ * * * during the taxable year paid or permanently set aside for * * * [statutorily exempt] purposes * * *.’ No action of the petitioner could change that fact." Estate of John E. Myra, supra at 959. "* * * [I]f the deduction qualifies in other respects,[23] there is no question about the deduction being a valid one, even though no payment is actually made to the charitable beneficiary during the taxable year. The statute does not require that it be actually paid —it requires that it be ‘paid or permanently set aside.’ * * *" Commissioner of Internal Revenue v. Leon A. Beeghly Fund, supra, 310 F.2d at 760. Where trust income is "irrevocably dedicated for the use and benefit of charitable organizations," it is " ‘perma-

---

**22.** After the discovery by the accountant for the trusts of the erroneous payments, all amounts which had been paid to unnamed charities were charged on the books of the trust as receivables from the trustees.

**23.** There is no issue in this case concerning the qualification of the beneficiaries involved as charities.

nently set aside' for charitable purposes within the meaning of" the statute. Id., at 761. In the comparable case of an estate, the "permanent setting aside of the income" is accomplished "by the will itself". Any rule conditioning the deduction, in the case of an estate or trust, on actual payment "would make the imposition of the tax depend upon some act of the executors, which had no result in law upon the rights of the parties, and is not in accordance with what we have found to be the expressed intent of the Congress, which was to tax the income received by the estate which would pass to any person subject to taxation, but relieve from taxation the income set aside by the terms of the will for corporations of the character described." Bowers v. Slocum, supra, 20 F.2d at 352.

Accordingly, charitable deductions may be taken for the full amount of income required by the Declarations of Trust to be paid to the designated charities.