ESTELLE MORRIS TRUSTS NOS. 401 THROUGH 410, NATHAN SCHWARTZ, TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

B. R. MORRIS TRUSTS NOS. 401 THROUGH 410, NATHAN SCHWARTZ, TRUSTEE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3324–66, 6624–66, 3325–66, 6623–66.   Filed October 9, 1968.

*Alan N. Halkett*, for the petitioner.
*James A. Thomas*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies against petitioner in the following amounts:

| Petitioner | Docket No. | FYE Aug. 31— | Amount |
|---|---|---|---|
| Estelle Morris Trusts Nos. 401 through 410, Nathan Schwartz, trustee | 3324-66 | 1961 | $23,111.89 |
| | 3324-66 | 1962 | 21,475.95 |
| | 6624-66 | 1963 | 33,645.60 |
| | 6624-66 | 1964 | 34,889.33 |
| | 6624-66 | 1965 | 27,455.23 |
| B. R. Morris Trusts Nos. 401 through 410, Nathan Schwartz, trustee | 3325-66 | 1961 | 23,111.89 |
| | 3325-66 | 1962 | 21,475.95 |
| | 6623-66 | 1963 | 33,645.61 |
| | 6623-66 | 1964 | 34,888.57 |
| | 6623-66 | 1965 | 27,454.62 |

These deficiencies arise out of respondent's determination that certain trusts created by 10 trust instruments executed by E. S. Morris and Etty Morris on September 11, 1953, constituted two trusts for Federal income tax purposes, rather than 20 trusts as reported. Each notice of deficiency contained the following statement explaining the determination: "It is determined that you constitute a single trust for federal income tax purposes under the provisions of sections 61, 642, 643, 6012 and other applicable provisions of the Internal Revenue Code." After the petitions and answers were filed, respondent filed amended answers alleging that the Estelle Morris Trusts Nos. 401 through 410 and the B. R. Morris Trusts Nos. 401 through 410 together constituted a single trust for Federal income tax purposes for all the years in question and praying that this Court sustain the resulting deficiencies.

The issues presented for decision are: (1) Whether each of the 10 declarations of trust executed by E.S. Morris and Etty Morris on September 11, 1953, created 1 trust or 2 trusts for Federal income tax purposes; and (2) whether, depending on the resolution of issue (1), the trusts created by the 10 declarations of trust are taxable as 1 or 2 trusts as respondent contends, or as 10 or 20 trusts, as petitioner contends, or as some other intermediate number.

## FINDINGS OF FACT

Some of the facts have been stipulated and the stipulations and exhibits [1] thereto are incorporated herein by reference.

Nathan Schwartz (hereinafter referred to as petitioner) is the trustee of the Estelle Morris Trusts Nos. 401 through 410 and of the B. R. Morris Trusts Nos. 401 through 410. He was a legal resident of Beverly Hills, Calif., at the time the petitions in these cases were filed. Federal income tax returns for each of the 20 trusts were filed with the district director of internal revenue at Los Angeles, Calif., for each of the years here involved.

E. S. Morris was a successful corporate executive engaged primarily in the furniture-manufacturing business. He also engaged in some real

---

[1] Stipulation of Facts No. 2, pars. 29 and 30, identified certain exhibits which were objected to by petitioner at trial on the ground that they constituted inadmissible hearsay. After thoroughly examining these exhibits, we are of the opinion that Exhibits 15–O, 43–AQ, 45–AS, 57–BE, and 58–BF constitute inadmissible hearsay and that respondent did not lay a sufficient foundation to bring them within the "business records" exception to the hearsay rule. *Carroll* v. *United States,* 326 F. 2d 72 (C.A. 9, 1963) ; *Standard Oil Co. of California* v. *Moore,* 251 F. 2d 188, 212–214 (C.A. 9, 1957). With respect to Exhibit GS, we are of the opinion that sufficient foundation was laid for its admission and our ruling to that effect will remain unchanged.

At petitioner's request, we have also reconsidered our ruling that Exhibits 201 and 202 are not admissible. We find no basis for changing that ruling and accordingly no findings have been based on these exhibits.

estate investment activities over a period of about 25 years. For a number of years prior to his death in December 1956, E. S. Morris made gifts to his children and grandchildren. Some of these gifts took the form of trusts, established by him and his wife, Etty Morris, for each of their 11 grandchildren. E. S. Morris left an estate valued in excess of $500,000.

Barney R. (B. R.) Morris is the son of E. S. and Etty Morris. B. R. Morris and Estelle Morris are husband and wife and in September 1953 had two children: Karen, then age 11, and Richard, then age 8. B. R., Estelle, Karen, and Richard Morris are now living, and B. R. and Estelle have no other children.

On September 11, 1953, E. S. and Etty Morris executed, as trustors (grantors), 10 written instruments, each designated "Declaration of Trust." Each declaration of trust was identical in form, except as to the period for accumulation of income, and the date the trust was to terminate.

There are no number designations, as such, in the trust instruments, but after they were executed they were given number designations, namely, 401 through 410. The trusts were also sometimes further designated Estelle Morris Trusts Nos. 401 through 410 and B. R. Morris Trusts Nos. 401 through 410. These trusts are sometimes herein collectively referred to as Morris Trusts.

The declarations of trust provide that the trustee is to accumulate the income from the trust estate for the life of the primary beneficiaries, Barney R. Morris and Estelle Morris. The trustee is required to distribute income and principal to the primary beneficiaries upon written request of the primary beneficiaries and a showing by the primary beneficiary that he is unable to maintain his accustomed standard of living. The trustee is given the discretionary power to distribute current or accumulated income and principal, in case of emergency, to any beneficiary or issue of any beneficiary.

Each declaration of trust contains the following provisions concerning the construction and administration of the trust estate:

### (A) DESIGNATION OF PROPERTY

The Trustee shall apportion the Trust Estate into two (2) equal shares, each of which shall be a separate Trust; one of which shares shall be held, managed and distributed for the benefit of BARNEY R. MORRIS, and the other of which shares shall be held, managed and distributed by the Trustee for the benefit of ESTELLE MORRIS, both of whom are hereinafter referred to as the "Primary Beneficiaries."

\*　　\*　　\*　　\*　　\*　　＇　　\*

### (E) POWERS OF THE TRUSTEE

\*　　\*　　\*　　\*　　\*　　\*　　\*

(25) Though it is the intention of the Trustors that the two shares created by the Trustors for the benefit of the Primary Beneficiaries, and all of the shares created for the benefit of the lawful issue of the Primary Beneficiaries, shall each constitute a separate Trust, nevertheless, for the sake of convenience in acquiring, holding, and managing such shares, the Trustee shall not be required to partition any property of this Trust received by him, but may hold or sell the same jointly for all shares according to their respective interests therein, and similarly, the Trustee may pool or combine the principal of all shares in making investments or re-investments, and the Trustee may hold or sell the same jointly for all shares according to their respective interest therein, assigning or apportioning to each share its interest therein, all as the Trustee, in his discretion, may determine.

Upon the death of a "primary beneficiary" prior to termination of the trust, his or her share is to be added to the share of the surviving primary beneficiary. After the death of both "primary beneficiaries," the trustee is to apportion the share or shares then existing equally among the surviving issue of the "primary beneficiaries," each share thereby created, to constitute a separate trust.

Paragraphs (B)(6)(a), (b), (d), and (e) of each declaration of trust contain provisions concerning the period of accumulation of income and the time for termination of the trust, and provide as follows:

### (B) DISTRIBUTION OF INCOME AND PRINCIPAL

(6) Upon the death of both of the Primary Beneficiaries, the Trustee shall apportion the share or shares then existing into as many equal shares as there may be lawful issue surviving the Primary Beneficiaries, per stirpes, each of which shares shall be a separate trust, and which shall be held, managed and distributed by the Trustee for the benefit of each of such issue, as follows:

(a) As to each share, in the event that both of the Primary Beneficiaries have died prior to the expiration of _____ years from the date hereof, the income from such share shall be accumulated until _____ years have elapsed from the date hereof and added to the principal of such share until the termination of this Trust as to such share, as hereinafter provided.

(b) As to each share, upon the expiration of the aforesaid _____ year period, or upon the death of both of the Primary Beneficiaries after the expiration of said _____ year period, all of the net income of said share shall be distributed to the beneficiary thereof in monthly or other convenient installments, but not less frequently than annually, provided, however, that in no event shall the beneficiary thereof receive an amount in excess of the sum of Two Hundred Fifty Dollars ($250.00) per month, and any income in excess of the distribution herein provided, shall be accumulated and added to the principal of such share, until the termination of this Trust as to such share.

\*          \*          \*          \*          \*          \*          \*

(d) As to each share, upon the date when the beneficiary thereof attains his or her _____ birthday, such share shall be distributed to such beneficiary, and upon such distribution, the Trust as to such share shall terminate.

(e) As to each share, in the event of the death of the beneficiary thereof prior to the termination of this Trust as to such share, such share shall be held in trust for the benefit of the living issue then surviving of the beneficiary, per stirpes, and shall be distributed when each of such issue attains his or her 21st birthday, and in the event such beneficiary leave no issue, then such share shall be divided and augment equally the shares of the other lawful issue of the Primary Beneficiaries then surviving, per stirpes, provided, however, that in the event that at such time any of the other lawful issue of the Primary Beneficiaries have not attained his or her _____ birthday, and is a beneficiary under this Trust, the portion of such share to which such other lawful issue of the Primary Beneficiaries shall be entitled, shall be added to and become a part of the principal of the share held for such issue, and upon such distribution, as aforesaid, the Trust as to such share shall terminate.

Different figures were inserted in the blanks left in the quoted paragraphs as follows:

| Trust No. | (B)(6)(a) and (B)(6)(b) | (B)(6)(d) and (B)(6)(e) | Trust No. | (B)(6)(a) and (B)(6)(b) | (B)(6)(d) and (B)(6)(e) |
|---|---|---|---|---|---|
| | *Years* | *Birthday* | | *Years* | *Birthday* |
| 401 | 10 | 25th | 406 | 15 | 30th |
| 402 | 11 | 26th | 407 | 16 | 31st |
| 403 | 12 | 27th | 408 | 17 | 32d |
| 404 | 13 | 28th | 409 | 18 | 33d |
| 405 | 14 | 29th | 410 | 19 | 34th |

Each trust is irrevocable and gives the trustee broad investment powers. E. S. Morris was designated trustee in each of the declarations of trust and served in that capacity until his death in December 1956. Thereafter, Etty Morris served as trustee of each of the trusts until she resigned in January 1959. Etty Morris died in March 1959. Leon Kent succeeded Etty Morris as trustee and served until February 1963. Nathan Schwartz succeeded Leon Kent and since February 1963 has been trustee of each of the trusts. Although the declarations of trust provide for trustee's fees, no such fees have been paid since the creation of the trusts.

At the time the trusts were created, E. S. and Etty Morris made initial cash gifts to the trusts, as follows:

| Trust | Amount | Trust | Amount |
|---|---|---|---|
| 401 | $750 | 406 | $1,250 |
| 402 | 1,000 | 407 | 875 |
| 403 | 1,875 | 408 | 750 |
| 404 | 800 | 409 | 750 |
| 405 | 1,375 | 410 | 500 |

These gifts were made on September 11, 1953, by 10 separate checks, each of which was drawn on the personal bank account of E. S. and Etty Morris, and each was made payable to E. S. Morris, trustee, for

trusts Nos. 401 through 410, respectively. In addition to the cash gifts, E. S. Morris made loans to the trusts on September 11, 1953, as follows:

| Trust | Amount | Trust | Amount |
|-------|--------|-------|--------|
| 401 | $2, 250 | 406 | $3, 750 |
| 402 | 2, 750 | 407 | 2, 625 |
| 403 | 5, 625 | 408 | 2, 250 |
| 404 | 2, 450 | 409 | 2, 250 |
| 405 | 4, 125 | 410 | 1, 500 |

These loans were evidenced by promissory notes signed by E. S. Morris, trustee, and payable to E. S. Morris individually. The gifts and loans to the trusts were made from the funds of E. S. and Etty Morris, and trust funds were not provided by anyone else.

On September 17, 1953, 10 separate bank accounts (one for each of the numbered trusts) were opened in the name of E. S. Morris, trustee, and the gifts and loans were deposited therein. Ten sets of printed checks were prepared, one for each account, and each bore the name of the trustee and the individual number of the respective trust.

At all times since the creation of these Morris Trusts in 1953, separate books of account and records have been kept for each numbered trust, 401 through 410. Separate bank accounts have been maintained, separate checks have been used, and separate bank statements have been received for each of the numbered trusts. No separate books and records were kept within each numbered trust for the B. R. Morris and Estelle Morris Trusts.

In each year since the inception of the trusts, 20 separate tax returns—10 returns for Estelle Morris Trusts Nos. 401–410 and 10 returns for B. R. Morris Trusts Nos. 401–410—have been filed. Separate annual financial statements have been prepared for each numbered trust by Samuel Pop & Co., certified public accountants.

The principal activities of the Morris Trusts since their inception have been the investment in real property and the acquisition of trust deed notes and land sales contracts at discount. At no time have the Morris Trusts been active participants in any operating venture in which B. R. Morris was involved. B. R. Morris and Estelle Morris have never received any sums of money from the trusts nor do they expect to. The trusts have not made loans to each other or otherwise commingled their assets and funds.

At or about the time the Morris Trusts were created, multiple trusts also were created by friends or associates of the Morris family.

On or about September 11, 1953, John S. and Anna S. Zuckerman executed, as trustors, 10 written instruments, each designated "Declaration of Trust." There are no number designations contained in the trust instruments themselves, but after they were executed they

were given number designations, namely, 301 through 310. These trusts are sometimes herein collectively referred to as Zuckerman Trusts. The primary beneficiaries of the Zuckerman Trusts, 301, 303 through 308, and 310 are Edward K. Zuckerman, son of John S. and Anna S. Zuckerman, and Ola Zuckerman.

The books and records of trusts Nos. 303 through 310 (the books and records of trusts Nos. 301 and 302 are no longer in existence) indicate that on or about September 11, 1953, John S. Zuckerman made contributions and loans to the Zuckerman Trusts as follows:

| Trust | Contribution | Loan | Trust | Contribution | Loan |
|-------|--------------|------|-------|--------------|------|
| 303 | $2,000 | $6,000 | 307 | $800 | $2,450 |
| 304 | 800 | 2,450 | 308 | 750 | 2,250 |
| 305 | 1,300 | 3,950 | 309 | 750 | 2,250 |
| 306 | 1,250 | 3,750 | 310 | 500 | 1,500 |

On September 1, 1953, Samuel Hayden and Katie Hayden executed, as trustors, 10 written instruments which were designated "Barney B. Hayden Family Trusts Nos. 1 through 10," respectively. These trusts were also sometimes referred to as 201(H) through 210(H). Barney B. Hayden was the primary beneficiary of each of these trusts.

On the same date, Samuel and Katie Hayden also executed, as trustors, 10 written instruments which were designated "Rose Hayden Furstman Family Trusts Nos. 1 through 10." These trusts were also sometimes referred to as trusts Nos. 201(F) through 210(F). Rose Hayden Furstman was the primary beneficiary of these trusts.

Also on September 1, 1953, Samuel and Katie Hayden executed, as trustors, 10 written instruments designated "Yetta Hayden Mintz Family Trusts Nos. 1 through 10," respectively. These trusts were also referred to as trusts Nos. 201(M) through 210(M). Yetta Mintz was the primary beneficiary of these trusts. Trusts 201(H) through 210(H), 201(F) through 210(F) and 201(M) through 210(M) are sometimes herein collectively referred to as Hayden Trusts.

Samuel and Katie Hayden are husband and wife, and Barney B. Hayden, Rose Hayden Furstman and Yetta Hayden Mintz are their children.

The books and records of the "Hayden Trusts" indicate that Samuel and Katie Hayden made equal contributions to each series of trusts on September 1, 1953, totaling as follows:

| Trust | Amount | Trust | Amount |
|-------|--------|-------|--------|
| 201 | $3,255 | 206 | $4,755 |
| 202 | 3,753 | 207 | 3,255 |
| 203 | 8,805 | 208 | 3,255 |
| 204 | 3,153 | 209 | 3,255 |
| 205 | 4,755 | 210 | 1,755 |

On September 11, 1953, Hattie Levi executed, as trustor, 10 written instruments designated "Trusts Nos. 1 through 10." The trusts were also sometimes referred to as trusts Nos. 101 through 110, or the Levi Trusts. S. Charles Lee and Miriam Lee, husband and wife, are the primary beneficiaries. Hattie Levi is the mother of S. Charles Lee. The books and records of trusts Nos. 101 through 110 indicate that on or before September 11, 1953, Hattie Levi made the following contributions to the trusts:

| Trust | Amount | Trust | Amount |
|-------|--------|-------|--------|
| 101 | $750 | 106 | $1,250 |
| 102 | 1,000 | 107 | 750 |
| 103 | 2,000 | 108 | 750 |
| 104 | 800 | 109 | 750 |
| 105 | 1,300 | 110 | 500 |

All the trust instruments creating the Zuckerman, Hayden, and Levi Trusts were similar to the instruments used in creating the Morris Trusts.

### Section 14 Property

In 1953, and for many years prior thereto, B. R. Morris was engaged in the purchase, subdivision, and development of real estate. These activities were conducted primarily through various corporate entities in which B. R. Morris had an interest. Grandview Building Co. (Grandview), a corporation owned equally by B. R. Morris and E. K. Zuckerman, was the principal company through which B. R. Morris conducted his business activities. E. K. Zuckerman and B. R. Morris entered the real estate business together in about 1943, and jointly conducted their business activities until about 1960. They were primarily tract homebuilders and, by 1953, they had constructed approximately 6,000 homes.

In the latter part of 1952, Grandview retained Engineering Service Corp. (Engineering) to study the feasibility of developing certain properties known as the Johnson Ranch. The Johnson Ranch consisted of approximately 1,500 acres of land, divided into two tracts, located in the southwest area of Los Angeles County, Calif. One tract, known as Johnson Ranch No. 1, included approximately 800 acres of land located in three sections: (1) The northeast, northwest, and southwest quarters of section 14, Township 3 South, Range 14 West, Los Angeles County, Calif. (hereinafter referred to as section 14 or section 14 property); (2) section 11; and (3) practically all of a section located due north of section 11. The second tract, known as Johnson Ranch No. 2, was located approximately 2½ miles west of section 14.

Early in 1953, B. R. Morris and E. K. Zuckerman, through entities in which they had an interest, acquired in association with others approximately 700 or 800 acres of the Johnson Ranch from an eastern syndicate. Among those associated with B. R. Morris and E. K. Zuckerman in acquisitions in section 11 of Johnson Ranch No. 1, and in Johnson Ranch No. 2, were S. Charles Lee and Samuel Hayden, business associates primarily engaged in industrial development. At the same time, Grandview acquired for approximately $971,000, 117 acres in the northern part of section 14 for Van Ness Building Co., a partnership in which Grandview was a partner. S. Charles Lee and Samuel Hayden had no interest in Grandview or Van Ness.

On August 14, 1953, Van Ness requested Engineering to prepare a sketch dividing part of the section 14 property and to prepare legal descriptions thereof. Pursuant to that request, Engineering submitted a sketch, dated September 14, 1953, dividing the property into 42 parcels; namely, parcels 1–13, 14A–25A, 14B–25B, C, D, and 26–28.

On September 17, 1953, the Morris, Zuckerman, and Hayden Trusts acquired the following parcels of section 14 property for the following prices:

| Trust | Parcels | Acreage | Purchase price |
|---|---|---|---|
| 201 | 1 | 1.49 | $6,628.32 |
| 301 | 3 | 1.56 | 6,864.78 |
| 401 | 4 | 1.59 | 6,327.24 |
| 202 | ¼ of 5 | ¼ int. 7.36 | 3,300.00 |
| 302 [1] | | | |
| 402 | ¼ of 5 | ¼ int. 7.36 | 3,300.00 |
| 203 | 6 | 10.91 | 12,472.50 |
| 303 | 7 | 10.91 | 25,254.59 |
| 403 | 9 | 10.91 | 28,928.07 |
| 204 | 10 | 16.60 | 47,602.08 |
| 304 | 12 | 16.60 | 48,273.24 |
| 404 | 13 | 16.60 | 44,602.08 |
| 205 | 14A & 14B | 16.21 | 45,141.63 |
| 305 | 15A & 15B | 16.21 | 42,476.32 |
| 405 | 16A & 16B | 16.21 | 39,898.41 |
| 206 | 19A & 19B | 16.21 | 45,310.62 |
| 306 | 20A & 20B | 16.21 | 44,343.13 |
| 406 | 21A & 21B | 16.21 | 43,019.82 |
| 207 | ¼ of C & D; 25A & 25B | ¼ int. 2.67;3.50 | 13,753.26 |
| 307 | ¼ of C & D; 24A & 24B | ¼ int. 2.67; 3.50 | 12,785.78 |
| 407 | ¼ of C & D; 22A & 22B | ¼ int. 2.67; 3.50 | 9,363.29 |
| 208 | ¼ of 26 | ¼ int. 4.321 | 2,525.00 |
| 308 | ¼ of 26 | ¼ int. 4.321 | 2,525.00 |
| 408 | ¼ of 26 | ¼ int. 4.321 | 2,525.00 |
| 209 | ¼ of 27 | ¼ int. 3.93 | 2,675.00 |
| 300 | ¼ of 27 | ¼ int. 3.93 | 2,675.00 |
| 409 | ¼ of 27 | ¼ int. 3.93 | 2,675.00 |
| 210 | ¼ of 28 | ¼ int. 3.20 | 1,650.00 |
| 310 | ¼ of 28 | ¼ int. 3.20 | 1,650.00 |
| 410 | ¼ of 28 | ¼ int. 3.20 | 1,650.00 |

[1] It is not known which parcel trust No. 302 acquired or the purchase price.

The Levi Trusts, i.e., trusts Nos. 101–110, acquired parcels 2, 8, 11, 17A, 17B, 18A, 18B, 23A and 23B, and one-fourth undivided interests

in parcels 5, 26, 27, 28, C, and D. It is not known which Levi Trust acquired which parcel or the amounts paid.

The section 14 property acquired by the Morris Trusts was carried on their books and records as being owned by trusts Nos. 401, 402, etc. There was no further breakdown between the B. R. Morris Trusts and Estelle Morris Trusts.

A substantial portion of section 14 was less than 47.5 feet above sea level and was subject to periodic flooding. This portion had been declared by an ordinance of Los Angeles County to be unfit for human habitation, which meant that no building permit for residential buildings could be issued in that area. The 117-acre tract purchased by Grandview for Van Ness was largely outside of the area subject to flooding, although a portion located in the southwest corner of this tract was subject to flooding. This tract was also subject to drainage problems, separate and apart from the flooding of section 14.

After the acquisition by Grandview of the 117-acre tract, Engineering continued to perform services for Grandview in the development of its section 14 property. The work done by Engineering was necessary to the development of the 117-acre tract even though it involved and sometimes benefited section 14 property located outside the tract.

Beginning in the latter part of 1953 and continuing into 1955, Engineering performed various services on section 14 property, unrelated to the 117-acre tract, owned by various Morris, Zuckerman, Hayden, and Levi Trusts. This work was performed primarily in the northwest and southwest quarters of section 14 and included: (1) Preparation and submission of tentative maps to the City of Gardena and others; (2) revision of tentative maps; (3) preparation of plans and presentations to the City of Gardena regarding requests for zoning changes; (4) preparation of plans for residential and industrial development; (5) negotiations with the City of Gardena relating to building and inspection fees and street locations; and (6) preparation of engineering studies and plans for grading, filling, and drainage. These activities enhanced the value of the various trust properties, yet the trusts did not pay any portion of the costs of this work.

Between June 17, 1954, and March 22, 1956, the Morris, Zuckerman, and Hayden Trusts sold their interests in the section 14 property.[2] Some of the sales were to corporations or partnerships owned or controlled by the primary beneficiaries of the various trusts. The follow-

---

[2] There is no evidence in the record as to the disposition of the property held by the Levi Trusts.

ing is a schedule of these sales, the purchasers, and the proceeds (to the nearest dollar) when known:

| Date | Trust No. | Parcel No. | Selling price | Gross profit | Purchaser |
|---|---|---|---|---|---|
| 6/17/54 | 202 | ¼ int. in 5 | $41,398 | $38,098 | Hollypark Western Co. |
| Do | 302 | ¼ int. in 5 | 39,250 | Unknown | Do. |
| Do | 402 | ¼ int. in 5 | 39,250 | 35,809 | Do. |
| Do | 208 | ¼ int. in part 26* | 16,250 | 13,725 | Do. |
| Do | 308 | ¼ int. in part 26* | 17,500 | 15,769 | Do, |
| Do | 408 | ¼ int. in part 26* | 17,500 | 15,769 | Do. |
| 7/9/54 | 209 | ¼ int. in part 27* | 28,750 | 26,075 | Hollypark Crenshaw Co. |
| Do | 309 | ¼ int. in part 27* | 28,125 | Unknown | Do. |
| Do | 409 | ¼ int. in part 27* | 28,750 | 26,803 | Do. |
| Do | 210 | ¼ int. in part 28* | 21,249 | 19,599 | Do. |
| Do | 310 | ¼ int. in part 28* | 21,250 | 19,961 | Do. |
| Do | 410 | ¼ int. in part 28* | 21,250 | 19,961 | Do. |
| 9/7/54 | 201 | 1 | 17,578 | 10,950 | Hollypark 135th Street Co. |
| Do | 401 | 4 | 17,277 | 10,889 | Do. |
| Unknown | 301 | 3 | Unknown | Unknown | Do. |
| 9/24/54 | 203 | 6 | $147,285 | $134,813 | Condon Land Co. |
| Do | 303 | 7 | 147,285 | 122,031 | Do. |
| Do | 403 | 9 | 147,285 | 117,800 | Do. |
| Do | 204 | 10 (part) | 36,180 | Unknown | Do. |
| 12/9/55 | 204 | 10 (balance) | 191,870 | Unknown | Harly Building Co. |
| Do | 304 | 12 | Unknown | Unknown | Do. |
| Do | 404 | 13 | Unknown | Unknown | Do. |
| 3/22/56 | 205 | 14 | 234,642 | 189,501 | H. Hirsch & A. Edmunds |
| Do | 305 | 15 | 267,313 | 230,225 | Do. |
| Do | 405 | 16 | 232,798 | 191,478 | Do. |
| Do | 206 | 19 | 232,649 | 187,339 | Do. |
| Do | 306 | 20 | 232,609 | 192,866 | Do. |
| Do | 406 | 21 | 232,568 | 180,101 | Do. |
| Do | 207 | 25; ¼ int. C & D | 82,459 | 68,706 | Do. |
| Do | 307 | 24; ¼ int. C & D | 102,738 | 92,803 | Do. |
| Do | 407 | 22; ¼ int. C & D | 82,503 | 69,701 | Do. |

*Between 7/9/54 and 11/24/55, trusts Nos. 208, 308, 408, 209, 309, 409, 210, 310, and 410 sold their remaining interests in parcels 26, 27, and 28 to unrelated third parties.

Hollypark Western Co. was a partnership in which Samuel Hayden, S. Charles Lee, B. R. Morris, and E. K. Zuckerman held interests. Hollypark Crenshaw Co. was a partnership in which B. B. Hayden [3] and S. Charles Lee held interests. Neither B. R. Morris nor E. K. Zuckerman had an interest in Hollypark Crenshaw Co. Hollypark 135th Street Co. was a partnership in which B. B. Hayden,[4] S. Charles Lee, B. R. Morris, and E. K. Zuckerman had interests. Condon Land Co. was a corporation wholly owned by the Hayden Building Corp. Neither B. R. Morris nor E. K. Zuckerman had an interest in the corporation. Harly Building Co. was unrelated to B. R. Morris and was not shown to be related to the Zuckerman, Hayden, or Lee families. Harold Hirsch and Arthur Edmunds were business associates of B. R. Morris and E. K. Zuckerman.

## Section 11 Property

In addition to the section 14 purchases, the Morris and Zuckerman Trusts, as well as entities in which B. R. Morris and E. K. Zuckerman

[3] Although the stipulation refers to a "B. R. Hayden," it is apparent that B. B. Bayden was the person intended.

[4] See fn. 3, *supra*.

were individually interested, acquired property located directly north of section 14. This property will hereinafter be referred to as section 11 property.

The section 11 property was acquired on July 22, 1954, for a purchase price of $5,700 per numbered trust, with each numbered trust making a downpayment of $125 and executing a promissory note secured by a deed of trust for the balance of the purchase price.

For the fiscal year ending August 31, 1955, each numbered Morris and Zuckerman Trust received $472.50 in rental income from the section 11 property. In the fiscal year ending August 31, 1956, each numbered Morris and Zuckerman Trust received $87.75 in rental income from this property. The section 11 property was subsequently sold by two separate sales. The first sale was on April 19, 1955, to Hollypark South Industrial Co. (a copartnership in which B. R. Morris and E. K. Zuckerman had beneficial interests) for a selling price of $9,375, and gross profit of $5,543.33, per numbered trust. The second sale was on January 31, 1956, to Pacific Drive-In Theatres, for a selling price of $4,905, and gross profit of $2,912.91, per numbered trust.

### Palos Verdes Property

During the period December 7, 1954, to December 7, 1955, the Morris and Zuckerman Trusts acquired property in the Palos Verdes area. At or about the same time the trusts were acquiring Palos Verdes property, operating companies and/or entities in which B. R. Morris and E. K. Zuckerman had interests were also acquiring property in the same general area.

All of the property acquired by the Morris and Zuckerman Trusts in the Palos Verdes area was purchased from Palos Verdes Properties. B. R. Morris had no interest in Palos Verdes Properties.

The books and records of the Morris and Zuckerman Trusts indicate that on December 9, 1955, trusts Nos. 304 and 404 sold all of their respective interests in the Palos Verdes property, along with their remaining interests in their respective parcels in section 14, to Harly Building Co. The purchase price and gross profit were not separately stated for each parcel, but trust No. 304 had a total selling price for all of its property of $334,092.12 and a cost basis of $80,674.92, and trust No. 404 received a total of $333,984.12 and had a cost basis of $82,414.88.

The books and records of the Morris and Zuckerman Trusts indicate that on March 22, 1956, the remaining trusts sold their respective interests in the Palos Verdes property to Harold Hirsch and Arthur Edmunds for profits in excess of 50 percent.

The sales by the Morris and Zuckerman Trusts to Hirsch and Edmunds and Harly Building Co., referred to above, were by land contracts. Shortly after the sale, the land contracts were assigned to Palos Verdes Tract 21351, a partnership in which Harold Hirsch, Arthur E. Edmunds, E. K. Zuckerman, and B. R. Morris each had approximately a one-fourth interest. The partnership assumed the obligations under the land contracts. No payments were made for the assignments. Homes were constructed on the land by the partnership and sold to the general public.

### Other Trust Investments

Subsequent to the final sale of the Palos Verdes realty on March 22, 1956, the Morris Trusts remained relatively dormant until September 19, 1958, when they began to purchase first- and second-trust deeds and land contracts from various entities, many of which were related to B. R. Morris and E. K. Zuckerman.

Trust deed notes and land sales contracts acquired by the trusts were handled in the following manner: From 1958 to sometime in 1962, the notes and contracts would be conveyed by the seller to the trustee of the trusts. The trustee would transfer title thereto to Beverly Realty Co. for collection, and Beverly Realty Co. would then execute an agreement acknowledging that it had no beneficial interest in the notes or contracts and that it was holding the same wholly for the convenience of the trustee. In addition, the agreement empowered Beverly Realty Co. to order insurance for the property, to approve or disapprove transfers of a contract purchaser's interest therein, to collect transfer fees and expenses on such transfers, and to apply moneys received in payment from a contract purchaser against any trust deed or taxes due against the property. Beverly Realty Co. would then make the collections on the note and contracts and these collections were periodically remitted to the trustee. Beverly Realty Co., located in Beverly Hills, Calif., was a corporation solely owned by E. K. Zuckerman. The officers of the corporation were E. K. Zuckerman, president, and Joseph Meyerson, secretary.

Subsequent to a separation of business interests between B. R. Morris and E. K. Zuckerman sometime in 1962, Dayton Realty Co. began performing essentially the same services for the Morris Trusts that previously had been performed by Beverly Realty Co. Dayton Realty Co. was a corporation solely owned by B. R. Morris who was also its president.

A large portion of the trust deed notes and land sale contracts acquired by the Morris Trusts were at discounts ranging from 45 percent to 50 percent of the balance remaining due on the notes and contracts.

In addition to the purchase of first and second trust deeds and land contracts, the sole activities of the Morris Trusts from March 22, 1956, to August 31, 1965, have consisted, with few exceptions, of maintaining commercial bank accounts, making deposits in savings and loan accounts, and purchasing U.S. Treasury securities. The exceptions are as follows:

(a) In the fiscal year ending August 31, 1957, trusts Nos. 403, 404, 405, and 406 made loans of $80,100, $149,175, $148,770, and $38,700, respectively, to the Delaware Corp.

(b) In the fiscal year ending August 31, 1958, trusts Nos. 404, 405, and 406 made loans to the Grandview Building Co. of $152,571, $85,387, and $109,350, respectively.

(c) On October 20, 1960, trusts Nos. 404 and 405 each acquired an 18.18-percent undivided interest in a 30.897-acre parcel of land located in Palos Verdes for $60,000 each. (Earlier, on September 20, 1960, Zuckerman trusts Nos. 303 and 304 had each purchased an 18.18-percent undivided interest in this same parcel for the same price.)

(d) On October 18, 1960, trusts Nos. 406 and 409 each acquired a 25-percent undivided interest in tract 25000 in the San Fernando Valley consisting of 17 acres from N. W. Sonntag for a purchase price of $27,649 each. (Earlier, on September 22, 1960, Zuckerman Trusts Nos. 305 and 306 had each acquired a 25-percent undivided interest under the same terms and conditions.) Subsequent to the separation of business interests between B. R. Morris and E. K. Zuckerman, on December 14, 1962, trusts Nos. 406 and 409 sold their respective interests in this property to Beverly Realty Co. for $43,934 and $43,821, respectively. Trust No. 406 realized a gross profit of $16,285 from this transaction; trust No. 409, a gross profit of $16,174. At or about the same time the Morris and Zuckerman Trusts had acquired this property, operating companies and/or entities in which B. R. Morris and E. K. Zuckerman had varying interests were also acquiring property in the same general area.

(e) The books and records of the Morris Trusts indicate that on May 23, 1962, subsequent to the severance of business interests between B. R. Morris and E. K. Zuckerman, some of the trusts acquired undivided interests in a parcel of land of approximately 1,039 acres located in Ventura County, Calif., and commonly known as the Phillips Property. This property was acquired from Waite Phillips by the following trusts for the following prices:

| Trust No. | Interest Percent | Purchase Price |
|---|---|---|
| 402 | 7 | $87, 547 |
| 403 | 8 | 100, 053 |
| 404 | 6 | 75, 040 |
| 405 | 6 | 75, 040 |
| 406 | 8 | 100, 053 |
| 409 | 6 | 75, 040 |

At the time these trusts acquired their interests in the Phillips property, substantially all of the remainder of the property was purchased by entities in which B. R. Morris had substantial financial interests.

On May 23, 1963, the trusts owning Phillips Property donated their interests in the property to corporations which they each respectively wholly owned. Insofar as the record indicates, they still hold the property.

(f) In the fiscal year ending August 31, 1965, trust No. 408 purchased 500 shares of stock of the Commercial & Farmers National Bank for $10,000.

### ULTIMATE FINDINGS OF FACT

On September 11, 1953, E. S. Morris and Etty Morris, by 10 written declarations of trust, created 20 separate trusts. These trusts have been separately operated and administered since their creation, and constitute separate viable entities. E. S. Morris and Etty Morris created 20 trusts rather than 2 trusts principally for tax-avoidance reasons.

### OPINION

On September 11, 1953, E. S. and Etty Morris executed 10 instruments, each entitled "Declaration of Trust," designating B. R. Morris and Estelle Morris as primary beneficiaries. B. R. Morris is the son of E. S. and Etty Morris; Estelle is B. R.'s wife. Each instrument directs the trustee to accumulate the trust income for the life of the primary beneficiaries (subject to certain discretionary distributions) and, upon the death of both of them, to distribute the principal and accumulated income to trusts created for their surviving issue. The 10 instruments are identical in form except they prescribe differing periods for income accumulation and distribution, and differing termination dates. Cash in amounts ranging from $500 to $1,875 was transferred to each trust by the grantors, and loans in amounts ranging from $1,500 to $5,625 were made to each trust by E. S. Morris.

Each trust declaration named E. S. Morris as trustee and Etty Morris as successor trustee. E. S. Morris served as trustee until his death in December 1956. Etty served from that date until her resignation in January 1959. She was followed by Leon Kent, who served until February 1963, and Nathan Schwartz, who was trustee at the time of the trial.

The declarations of trust have always been administered separately. Treating each of the 10 declarations as two trusts, one for B. R. and one for Estelle, each trustee filed 20 separate income tax returns annually from 1953 through 1965, reporting in each return the income earned by the purported trust for which it was filed.

Finding that the grantors created multiple trusts rather than a single trust for tax-avoidance reasons, respondent determined that the 10 purported B. R. Morris Trusts constitute a single trust for Federal income tax purposes and that the 10 purported Estelle Morris Trusts constitute a single trust for Federal income tax purposes. By amended answer, respondent asserted that all 20 purported trusts constitute a single trust for Federal income tax purposes, and alleged increased deficiencies. The statutory notices of deficiencies cover the fiscal years ending August 31, 1961 through 1965; thus, the first 8 years of tax liabilities resulting from the trusts' activities are not before us.

Petitioner contends: (1) That each declaration of trust is sufficient to create two separate trusts; (2) that the grantors did not create 20 rather than 2 trusts for tax-avoidance reasons; (3) that even if tax avoidance were the motive for creating the multiple trusts, their viability as jural entities in the years before us (1961–65) should not be affected by the settlor's motive in 1953; and (4) that tax-avoidance motive is irrelevant in the taxation of trusts. We do not fully agree with either party.

As to petitioner's first contention, respondent apparently concedes that two or more trusts may be created by one instrument in an undivided *res* by the same grantor for different beneficiaries and that such trusts would be entitled to independent recognition for tax purposes. See *U.S. Trust Co.* v. *Commissioner*, 296 U.S. 481 (1936). He contends, however, that these trust instruments failed to establish separate trusts for Barney R. Morris and Estelle Morris, but created a single trust having two shares.

The question is a factual one.[5] We are not concerned with the reason why the grantors desired to create two trusts by one instrument; rather, we must determine whether the language they used was sufficient to accomplish this intent. See *U.S. Trust Co.* v. *Commissioner, supra; McHarg* v. *Fitzpatrick*, 210 F. 2d 792 (C.A. 2, 1954) ; *Commissioner* v. *McIlvaine*, 78 F. 2d 787 (C.A. 7, 1935), affd. 296 U.S. 488 (1936) ; *State Sav. Loan & Trust Co.* v. *Commissioner*, 63 F. 2d 482 (C.A. 7, 1933), affirming 25 B.T.A. 228 (1932).

Respondent notes that the provisions in the instruments concerning administration contain singular terms such as "this Trust" and "the Trust Estate." But these references are not inconsistent with the creation of separate trusts if read in the context of the whole instrument,

[5] Neither sec. 641(a), I.R.C. 1954 (all section references are to the Code of 1954, as amended, unless otherwise noted), which declares that the "taxable income * * * of estates or of any kind of property held in trust," nor sec. 641(b), quoted in fn. 9, *infra,* nor any other section of the Code gives any direct guidance as to whether income from "property held in trust" for more than one person under a single instrument is to be taxed as one trust, or as several.

particularly in light of the authority given the trustee to combine the assets for administrative convenience. *Kohtz Family Trust,* 5 T.C. 554, 557 (1945).

As shown by our findings, paragraph (A) of each trust instrument expressly directs that the trustee "shall apportion the Trust Estate into two (2) equal shares, each of which shall be a separate Trust," one for the benefit of Barney R. Morris and one for the benefit of Estelle Morris. Paragraph (E)(25) of each instrument, while providing that "for the sake of convenience" in administration the principal and income of the two shares may be combined or pooled, expressly reaffirms the intention of the grantors that the two shares created for the primary beneficiaries shall "each constitute a separate Trust." These specific directions by the grantors, stated clearly and unequivocally, cannot be ignored.

We need not rely solely on the cold language of the trust instruments, however, for here the grantors, acting in their capacities as trustees, have established a basis for our interpretation by meticulously administering the several trusts as separate entities and by filing 20 separate Federal income tax returns for each year.[6] Cf. *Helfrich's Estate* v. *Commissioner,* 143 F. 2d 43, 46 (C.A. 7, 1944), affirming 1 T.C. 590 (1943); *Estate of Marvin L. Pardee,* 49 T.C. 140, 148 (1967). While this may have been done to avoid taxes, it by no means alters the fact that it was done. Cf. *U.S. Trust Co.* v. *Commissioner, supra.* We conclude, therefore, that by each "Declaration of Trust" the grantors intended to create, and in fact created, two separate trusts.

The second issue for determination is whether E. S. and Etty Morris created the multiple trusts, as respondent contends, principally, "if not solely, for tax avoidance." The burden of proof on this issue rests with petitioners.[7] While recognizing that the burden is particularly onerous because of the lapse of time between the creation

---

[6] Respondent notes that each instrument was handled as one trust insofar as purchase and administration of property was concerned. This is consistent with par. (E)(25), quoted, *supra.* However, it was still necessary to file separate tax returns pursuant to the express language of sec. (A). See sec. 1.6012–3(a)(4), Income Tax Regs.: "A trustee of two or more trusts must make a separate return for each trust, even though such trusts were created by the same grantor for the same beneficiary or beneficiaries." Cf. *Fred W. Smith,* 25 T.C. 143 (1955).

[7] Although it fairly may be contended that the deficiency notices did not adequately apprise petitioner that respondent was relying on the tax-avoidance theory, respondent's position was made known to petitioner well in advance of trial. On Sept. 26, 1966, petitioner filed a motion for a more definite statement pursuant to Rule 17(c)(1), Tax Court Rules of Practice. Hearing on this motion was held on Dec. 5, 1966, at which time counsel for respondent expanded the deficiency notices, stating: "Now, the clear import of this statement is that the Commissioner found the purported creation and operation of the ten trusts instead of one in this situation constituted a sham. In other words, a transaction entered into for the sole or principal purpose of tax avoidance." This statement was accepted in lieu of a more definite statement and the motion was denied. Trial of this case was held on Sept. 19, 1967. In these circumstances the burden of proof as to this issue was clearly on petitioner.

of the trusts and the attack by respondent, we are reminded nevertheless that difficulty or even impossibility of proof does not relieve petitioner of the burden. *Burnet* v. *Houston*, 283 U.S. 223 (1931); *Interlochen Co.* v. *Commissioner*, 232 F. 2d 873, 879 (C.A. 4, 1956), affirming 24 T.C. 1000 (1955); *George Ungar*, 18 T.C. 688, 689 (1952), affd. 204 F. 2d 322 (C.A. 2, 1953).

The only direct evidence offered by petitioner on this issue was the testimony of B. R. Morris, one of the primary beneficiaries, that his father was not motivated by tax avoidance in the creation of the trusts. But this testimony, uncorroborated by any evidence of what the grantors' alleged nontax motives were, must be weighed against circumstances which, we believe, require our ultimate finding that the grantors created 20 trusts rather than 2 trusts principally for tax-avoidance reasons.

The Johnson Ranch property, including section 14, had been under study by the Morris family since at least late 1952. Both E. S. Morris and B. R. Morris were wealthy, successful businessmen and investors. Large profits were reasonably anticipated from the ultimate development of the section 14 property, and such income, if directly received by either of them would have augmented already sizable incomes they had from other sources and would have been subject to high tax rates. Moreover, had a single entity acquired the section 14 property, subsequent sales might not have been accorded capital gains treatment. See sec. 117(j), I.R.C. 1939; sec. 1221, I.R.C. 1954.

It is against this background that we must view the execution of the 10 trust instruments, all executed on the same day by the same grantors with the same beneficiaries, differing only as to time periods for accumulation, distribution, and termination. The amounts contributed in trust under each declaration were relatively small, ranging from $500 to $1,875. Each instrument recited that "since said beneficiaries do not require such funds at this time" it was the grantors' intent "to permit the gifts so made to accumulate for the benefit and use of such beneficiaries in the future." As detailed in our findings, the Zuckerman, Hayden, and Levi families concurrently created multiple trusts. Employing the trust funds and sums contemporaneously loaned to the trusts by E. S. Morris and, in some instances by giving mortgages as security, each of the 10 Morris Trust administrations acquired one or more small parcels of land, all located in section 14. It was never intended that the trusts would develop the section 14 property; rather they would hold it as an investment for eventual resale. Contiguous properties were developed by various interests owned or associated with B. R. Morris, and such development, along with reclamation and

drainage operations, enhanced the value of the trusts' parcels which were sold at large profits between June 17, 1954, and March 22, 1956.[8]

In the light of these facts, and in the absence of any substantial evidence to the contrary, we conclude that petitioner has failed to carry his burden of proof. He has failed to prove that the grantors did not create multiple trusts in an attempt to reduce the tax payable on the gain expected from the sale of section 14 and on the income anticipated from investment of the proceeds. While, on brief, petitioner theorizes that the Morris, Zuckerman, Hayden, and Levi families created multiple trusts to facilitate the division of section 14 on an equitable basis, no testimony was offered to support this theory. Although E. S. Morris was dead at the time of the trial, other principals were available to testify. We cannot assume that their testimony would have supported petitioner's theory.

The third question presented is whether the "taint" of tax avoidance has been cleansed by the passage of time, so that the motive of the grantors in 1953 did not continue to soil the trusts in the years before us. We believe that this question must be answered in the negative.

While the passage of time may be said to have cleansed the trusts of any effects of the efforts by E. S. Morris to reduce the family's tax on the large amount of income expected to be derived from the sale of the parcels acquired in section 14, there is the continuing tax benefit to the ultimate secondary beneficiaries from the accumulating income of the multiple tax entities. We think it clear that this was an objective E. S. Morris sought to achieve. In that sense, if the initial tax-avoidance purpose contaminated the trusts when they were created, the contamination has not been cured.

Having determined that the Morris Trusts were created primarily for tax-avoidance purposes, and that this purpose continues to "taint" the trusts' income, we must now decide the final and most difficult question presented, i.e., the legal consequences of our determinations. We must decide whether each of the several trusts for the same beneficiary should be accorded independent significance as a taxable entity, or whether, as a matter of law, all of these trusts should be consolidated for purposes of Federal income taxation.

The views of the parties on the effect of a finding of tax-avoidance purpose are widely divergent. Relying on *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *Knetsch* v. *United States*, 364 U.S. 361 (1960); *Gold-*

---

[8] Lengthy testimony and hundreds of exhibits were introduced relating to the development of section 14 by B. R. Morris and his associates. Much of this evidence was particularly related to years not in issue (1953–60) and would have been more pertinent to the question of the deductibility of certain items or, perhaps, to a reallocation of income from the trusts to other parties under secs. 61, 162, 482, and other provisions of the 1954 Code. Nevertheless, we have made rather extensive findings concerning these transactions at the request of the parties.

*stein* v. *Commissioner*, 364 F. 2d 734 (C.A. 2, 1966); *Shaw Construction Co.* v. *Commissioner*, 323 F. 2d 316 (C.A. 9, 1963); and *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3, 1959), respondent characterizes these trusts as shams lacking business purpose, which, apart from the anticipated tax benefit, are without substance. Petitioner contends that the tax motive in creating the trusts does not change their character. He contends that in substance, as well as form, 10 separate trusts were established for each beneficiary and that, under the provisions of section 641(b),[9] each trust should be treated as a separate taxable entity.

Proper consideration of respondent's arguments must begin with the realization that the Internal Revenue Code, by recognizing even one trust for tax purposes, sanctions to some degree income splitting and the resulting lessening of taxes. Many of the advantages of multiple trusts—including accumulation of income at a lower tax rate—may be accomplished to a lesser extent by a single trust. We are concerned here only with a quantitative extension of the advantages of a single trust, a difference in degree; and not with a qualitatively distinct phenomenon, that is, a difference in kind. See Gordon, "Multiple Trusts: The Consolidation Approach," 4 Wayne L. Rev. 25, 27 (1957).

Moreover, it must be noted that while Congress has carefully delineated certain areas in which tax-avoidance motive is the touchstone of tax liability,[10] it has enacted no such provisions in the trust area. To the contrary, since the Revenue Act of 1916, which provided for the first time that trusts would be treated as separate taxable entities,[11] the tax laws have recognized implicitly that trusts may be used as income-splitting devices.

Furthermore, Congress has not substantially limited the tax-avoidance utility of multiple trusts despite repeated calls for legislative reform. While there is some indication that the problem of multiple trusts was considered by Congress as early as 1932,[12] the first

---

[9] SEC. 641. IMPOSITION OF TAX.

(b) COMPUTATION AND PAYMENT.—The taxable income of an estate or trust shall be computed in the same manner as in the case of an individual, except as otherwise provided in this part. The tax shall be computed on such taxable income and shall be paid by the fiduciary.

[10] Sec. 269 disallows tax benefits otherwise available in the corporate area as a result of certain acquisitions, the "principal" purpose for which is tax avoidance. See. 306(b)(4) allows capital gains treatment on dispositions of "Section 306" stock only if the plan for such dispositions did not have tax avoidance as one of its principal purposes. Sec. 482 permits the reallocation of income among certain related entities "to prevent evasion of taxes." Sec. 532 conditions the applicability of the accumulated earnings tax on a determination that the corporation was "formed or availed of the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation." Sec. 1551 disallows the corporate surtax exemption or the accumulated-earnings credit, available as a result of a transfer of assets, if a "major" purpose of the transfer was to secure such exemption or credit. See also secs. 302(c), 355(a)(1)(D)(ii), and 357(b).

[11] Revenue Act of 1916, ch. 463, 39 Stat. 756, sec. 2(b).

[12] See statement of Representative Crowther, Hearings before Joint Committee on Tax Evasion and Avoidance, 75th Cong., 1st Sess., Part 2, p. 270 (1937).

real call for reform was contained in a message to Congress from President Roosevelt in 1937.[13] Pursuant to his request, extensive hearings were held by the Joint Committee on Tax Evasion and Avoidance. At the hearings, the Treasury Department presented in great detail evidence of the flagrant use of multiple trusts to avoid taxes.[14] Congress' only response, in effect, was to reduce the exemption for trusts from $1,000 to $100 [15] and to state that "Further consideration and study will be given to the general problem of the proper treatment for tax purposes of multiple trusts to accumulate income." [16]

No further congressional action was forthcoming until the adoption of the 1954 Code. At that time the "five-year throw back" rule was adopted as part of subchapter J. with a view to lessening the tax advantages of accumulation trusts.[17] No specific provisions were adopted concerning multiple trusts.

On November 7, 1956, the Subcommittee on Internal Revenue Taxation of the House Ways and Means Committee released a report, prepared by the Joint Committee on Internal Revenue Taxation and the Treasury Department, entitled "Substantive Unintended Benefits or Hardships," which included a list of "Problems carried over from the 1939 code." Item 16 on the list referred to multiple trusts, and contained the following statement:[18]

> With certain limited exceptions under present law trust income which is accumulated is taxable to the trust and not the ultimate beneficiaries. The trusts in these cases are subject to the regular individual income tax rates and for the most part are treated the same for tax purposes as individuals, although their "personal exemption" is limited to $100. Cases have arisen where an individual in order to avoid the effect of higher individual income-tax brackets has set up several, instead of one, accumulation trusts for gifts in trust to the same individual.

---

[13] See Message of the President of the United States, H. Doc. No. 260, 75th Cong., 1st Sess., p. 4 (1937).

[14] Paul W. Bruton, an attorney in the Office of the Chief Counsel, Internal Revenue Service, summarized the Treasury's problem as follows:

> Right here I should add just what the Bureau's position has been with reference to these trusts. As I pointed out, practically all of them are created by separate trust instruments. Each trust was made entirely separate. Consequently the Bureau has felt that there was no ground on which it could assert that these trusts were not separate and distinct, and to be so treated.

Hearings, *supra* fn. 12, 266.

[15] This was done in two steps. Revenue Act of 1937, ch. 815, 50 Stat. 813, 829, sec. 401, eliminated the exemption for accumulation trusts which did not distribute an amount equal to their net income; Revenue Act of 1938, ch. 289, 52 Stat. 447, 518, sec. 163(a) deleted prior provisions for an exemption of $1,000 for trusts and, on grounds of administrative expedience, allowed a "credit" of $100 against net income. See H. Rept. No. 1860, 75th Cong., 3d Sess., p. 46 (1938) ; S. Rept. No. 1567, 75th Cong., 3d Sess., p. 24 (1938).

[16] H. Rept. No. 1546, 75th Cong., 1st Sess., p. 30 (1937) ; S. Rept. No. 1242, 75th Cong., 1st Sess., p. 32 (1937).

[17] Secs. 665–669. But see Kamin, Surrey, and Warren, "The Internal Revenue Code of 1954: Trusts, Estates and Beneficiaries," 54 Col. L. Rev. 1250 fn. 41 (1954), which suggests that these provisions invite the creation of multiple trusts to take advantage of the $2,000 exclusion.

[18] 3 P–H. 1956 Fed. Taxes par. 28,903.

It is suggested that solutions to this problem be examined by the subcommittee in connection with the study, now in progress, of the tax treatment of estates and trusts. The staff suggests that the subcommittee open the hearings, however, to those desiring to testify on this subject.

The matter was referred to an advisory group studying subchapter J. In May 1957, the advisory group released its first report, which it revised in November 1957, recommending a new Code section dealing with multiple trusts. The proposed section, subject to certain limitations, would have consolidated multiple trusts where the "primary beneficiaries" were "substantially the same." [19] The legislation proposed by the advisory group did not distinguish between multiple trusts created for tax reasons and multiple trusts created to satisfy non-tax motives.[20]

The advisory group recommendations were embodied in H.R. 3041, introduced on January 21, 1959, on which hearings were held by the House,[21] and objections to the proposal were made.[22] The bill did not get out of committee; instead, a substitute bill, H.R. 9662, prepared by the Ways and Means Committee and introduced on January 28, 1960, adopted an entirely different solution to the multiple-trust problem. This bill, which passed the House, did not consolidate multiple trusts. Rather, it would have added a 10-year "throw back" rule for multiple trusts, placing the burden on the beneficiaries at the time of distribution.[23]

The multiple-trust section of H.R. 9662 received a stormy reception when presented to the Senate Finance Committee, as numerous groups objected to both the advisory group approach and the House bill

---

[19] See Staff of Subcommittee on Internal Revenue Taxation on Subchapter J, House Committee on Ways and Means, 85th Cong., 2d Sess., Final report on Estates, Trusts, Beneficiaries and Decedents 1 (Comm. Print 1958).

[20] The advisory group proposal differed significantly from that of the American Bar Association, which would have authorized the Commissioner to consolidate multiple trusts where the "principal purpose" of the trusts was "to reduce or eliminate the tax liability of such trusts." See Friedman and Wheeler, "Effective Use of Multiple Trusts," 16th Ann. N.Y.U. Tax Inst. 981 fn. 46 (1958).

[21] See Hearings on Technical Amendments to Internal Revenue Code before Subcommittee of House Committee on Ways and Means, 84th Cong., 2d Sess., pp. 65, 82, 347–352, 426, 439 (1956); Hearings on General Revenue Revision before House Committee on Ways and Means, 85th Cong., 2d Sess., Part 1, pp. 576–577 (1958).

[22] Norman A. Sugarman, in a paper submitted to the House Ways and Means Committee, questioned whether an attack on multiple trusts was justified without a full reconsideration of the whole area of family taxation. He recommended that if legislation were to be enacted, it should be limited to "tax avoidance" situations and accompanied by provisions for advance rulings similar to that provided by sec. 367. This proposal and the reasons supporting it are of particular interest in view of the long delay by respondent in questioning the validity of these trusts. See Sugarman, "Estates and Trusts," in Compendium of Papers on Broadening Tax Base, House Committee on Ways and Means, vol. 3, 1749, 1754–1756 (Comm. Print 1959). See also Panel Discussions before House Committee on Ways and Means, 86th Cong., 1st Sess., pp. 940, 941, 946–949 (Comm. Print 1960).

[23] H.R. 9662, 86th Cong., 2d Sess., sec. 113 (1960); see H. Rept. No. 1231, 86th Cong., 2d Sess., pp. 15, 64–69 (1960).

approach.[24] The Senate version of H.R. 9662, reported out on June 18, 1960, rejected the House approach, and substantially reinstated the advisory group proposal.[25] The bill was passed over twice in the Senate, and was never brought to a vote during the session.[26]

Thus, we are faced with a problem that has repeatedly confronted Congress since at least 1937. The legislative history shows that Congress was fully aware of the tax-avoidance possibilities afforded by the use of multiple accumulation trusts when it adopted the exemption and credit changes in the 1937 and 1938 Acts, as well as when it wrote the 1939 and 1954 Codes.[27] We think it significant that Congress has taken no action to restrict the use of multiple trusts. We also think that it is significant that there is a great diversity of opinion as to what measures, if any, should be taken to correct the situation. This diversity of opinion is manifested by reference to the difference in the House and Senate versions of H.R. 9662 and the testimony thereon, as well as by the numerous articles written on the subject.[28]

In these circumstances the language of the Supreme Court in *American Automobile Assn.* v. *United States*, 367 U.S. 687, 697 (1961), is particularly apposite:

At the very least, this background indicates congressional recognition of the complications inherent in the problem and its seriousness to the general revenue. We must leave to the Congress the fashioning of a rule which, in any event, must have wide ramifications. The Committees of the Congress have standing

---

[24] See Hearings before Senate Committee on Finance on H.R. 9662, 86th Cong., 2d Sess., pp. 116, 120, 143–144, 147–148, 151–152, 165–169, 175–177, 188–189, 194–198, 203–204, 208 (1960).

While the Treasury Department generally supported the "consolidation" approach of the advisory group (and of respondent in this case), it recognized that it was not enough to provide that income of multiple trusts should be consolidated, without spelling out "the method of computing the tax in connection with the consolidation of income of multiple trusts, the method of allocating the tax among the trusts, or fix the responsibility as to which trustee shall bring the several trusts together. It has been suggested that matters as basic as computation of tax, allocation of liability for tax and fixing responsibility for consolidating trust income should not be left to regulations without some statutory guidance." Statement of Jay W. Glasmann, Assistant to the Secretary of the Treasury, *id.* at 86.

The advisory group representative, testifying in support of the consolidation approach, contrasted the tax liability of a single trust with that of 100 trusts. *Id.* at 124–129. Thus, again, Congress was fully advised of the tax-saving potential of multiple trusts.

[25] See S. Rept. No. 1616, 86th Cong., 2d Sess., pp. 2–3, 7–10, 33–39 (1960).

[26] At least one commentator has suggested that the failure of the Senate to consider the bill was in large part due to the differences in view as to the proper treatment of multiple trusts. See Surrey and Warren, Federal Income Taxation, xii (1960 ed. with 1961 Supp. Integrated).

[27] The Supreme Court has recognized that legislative materials accompanying a reenactment of a Code section may clarify, or even alter, the meaning of statutory language even though such language is not changed when reenacted. *Commissioner* v. *Bilder,* 369 U.S. 499, 501–504 (1962).

[28] See, e.g., Soter, "Federal Tax Aspects of Multiple Accumulation Trusts," 31 U. Cin. L. Rev. 351 (1962) ; Note, "Multiple Trusts and the Minimization of Federal Taxes," 40 Col. L. Rev. 309 (1940) ; Note, 24 U. Chi. L. Rev. 156 (1956) ; Childs, "Multiple Trusts— A Word of Warning," 107 Trusts and Estates 183 (1968). See also Surrey and Warren, *supra* at 928–929.

committees expertly grounded in tax problems, with jurisdiction covering the whole field of taxation and facilities for studying considerations of policy as between the various taxpayers and the necessities of the general revenues. The validity of the long-established policy of the Court in deferring, where possible, to congressional procedures in the tax field is clearly indicated in this case.[12] * * * [Footnote omitted.]

See also *Commissioner* v. *Brown*, 380 U.S. 563, 578–580 (1965).

We do not intend to imply that we believe congressional inaction here means complete sanction of tax avoidance through multiple accumulation trusts. Rather, we believe the lesson to be learned is that courts should be wary of broad-scale incorporation of the doctrine of "tax avoidance," or "business purpose," or "sham" in an area so fraught with its own particular problems and nuances. At the very least, we are required to limit those judicially developed doctrines to the situations which they were intended to cover.

Given the foregoing legislative background, we think that the "business purpose" test of *Gregory* and the "economic reality" test of *Knetsch*, *Weller*, and *Goldstein* are inapposite. None of those cases involves a history of detailed consideration by the Congress of the specific problem presented. Indeed, to have allowed the tax benefits sought in those cases would have frustrated the clearly defined legislative purposes of the controlling statutes. Moreover, we know that "business purpose" is often absent in donative dispositions of property through the device of the family trust. Cf. *Alden B. Oakes*, 44 T.C. 524, 532 (1965). Accordingly, a litmus test of "business purpose" on the part of the grantor will not suffice,[29] and nothing in the legislative history of section 641(b), reviewed above, leads us to believe that tax-motivated trusts necessarily lie outside its plain meaning.[30] Similarly, the continuing individual economic and legal viability of the Morris Trusts preclude the application of the "economic reality" test. Cf. *Irvine K. Furman*, 45 T.C. 360, 366 (1966), affirmed per curiam 381 F. 2d 22 (C.A. 5, 1967).

[29] Where purported trusts were created to handle transitory transactions they have been regarded, in substance, as mere agents of the grantors. See, e.g., *Trudie T. Munger, et al.*, 16 B.T.A. 168 (1929).

[30] In *Jackson* v. *Commissioner*, 233 F. 2d 289, 290 (C.A. 2, 1956), affirming 24 T.C. 1 (1955), the court discussed the circumstances in which a corporation may be disregarded as follows :

> A corporation may not be disregarded in respect to taxation if, *inter alia*, a bona fide intention in creating it was that the corporation itself should have some real substantial business function,[1] or if it actually engages in business; on the other hand, the corporation may be disregarded, in the absence of such an intention or activity. The intended or actual business functioning of the corporation itself, not the taxpayer's aim to be accomplished via the corporation, is the test.[2] [Footnotes omitted.]

Thus, even if it be assumed that a "trust-business purpose" test is applicable, the Morris Trusts meet that test since, as discussed below, each was intended to, and did, carry on substantial "business" functions.

After careful consideration, we are constrained to reach the conclusion that a finding of tax avoidance is simply not enough to invalidate multiple trusts. Evidence of tax avoidance does not invalidate family partnerships. *Commissioner* v. *Tower*, 327 U.S. 280 (1946); *Commissioner* v. *Culbertson*, 337 U.S. 733, 744 fn. 13 (1949). Corporations are not invalidated if the creator's aim is tax reduction, but are recognized for tax purposes if they engage in business activity. See, e.g., *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943); *Jackson* v. *Commissioner*, 233 F. 2d 289, 290 (C.A. 2, 1956), affirming 24 T.C. 1 (1955); *National Investors Corp.* v. *Hoey*, 144 F. 2d 466 (C.A. 2, 1944). We see no reason why the result should be different here.

Neither *Boyce* v. *United States*, 190 F. Supp. 950 (W.D. La. 1961), affirmed per curiam 296 F. 2d 731 (C.A. 5, 1961), relied upon by respondent, nor *Sence* v. *United States*, 394 F. 2d 842 (Ct. Cl. 1968), stand for the proposition that a finding of tax avoidance will invalidate multiple trusts. In *Boyce*, the grantor executed 90 trust indentures designating his son as beneficiary and his son's father-in-law as trustee. While the District Court in *Boyce* observed that "this entire scheme is but a mockery of our tax laws" (190 F. Supp. at 957), it based its decision on the ground that the 90 trusts were a sham *because they were in fact administered as one trust*.

Similarly, in *Sence*, the Court of Claims expressly reserved the tax-avoidance question which we face here since it was able to find that the 19 trusts were in fact administered as one. As the court noted (394 F. 2d at 851–852):

If it is permissible to create separate trusts solely for tax avoidance reasons (which as stated above, we do not decide), then it is appropriate to require a taxpayer to turn square corners—to dot his i's and cross his t's (if that metaphor is preferred)—in order to take advantage of the rule. Transactions between family members "calculated to reduce family taxes should always be subjected to special scrutiny."

*Commissioner of Internal Revenue* v. *Tower*, 327 U.S. 280, 291, 66 S.Ct. 532, 537, 90 L.Ed. 670 (1946). See also, *Helvering* v. *Clifford*, 309 U.S. 331, 335–337, 60 S.Ct. 554, 84 L.Ed. 788 (1940). As applied here, that principle means that the taxpayer with tax avoidance motivation must affirmatively show that he created and maintained truly separate trusts before he can claim that they should be taxed individually and not as one. In that respect plaintiffs have fallen down. * * *

Thus, the courts in *Boyce* and *Sence*, faced with multiple trusts created for tax-avoidance reasons, examined the forms used and the actions taken to see if the several trusts were in reality what they purported to be in form.

In applying this "special scrutiny" test we are aided by 13 years of operation of the Morris Trusts. We find that the trust declarations were in proper legal form to create 10 separate trusts for each benefi-

ciary. Cash was given and loaned to each trust separately. Individual bank accounts were established for the initial receipts as well as for receipts from all subsequent transactions. An interest in specific parcels of the Johnson Ranch property was acquired by each trust. That interest was eventually sold by each trust. The proceeds were invested and reinvested by the trustee. Ten separate sets of books and records were meticulously kept and maintained. The grantors never commingled their funds with the trust funds and none of the trust administrations ever commingled their funds with any of the other trusts. There was no "blurring of the lines among the various trusts"; each trustee was at all times careful to "dot his i's and cross his t's." Cf. *Sence* v. *United States, supra.* In all respects they were treated as, and indeed were, separate trusts.

In reaching the conclusion that the Morris Trusts cannot be consolidated despite the motive for their creation, we find support in the fact that the Supreme Court, in a case decided less than 3 years after *Gregory* v. *Helvering, supra,* held that amendments to a trust instrument were effective to create three separate taxable entities despite an express finding by the Board of Tax Appeals that the purpose of the amendments was "to reduce liability for income taxes on the income of the trust." *U.S. Trust Co.* v. *Commissioner, supra* at 485. With the history of multiple-trust legislation as a background, and with the case law as it has developed, we cannot say that each Morris Trust is not a "trust" within the meaning of that term as Congress must be understood to have used it in section 641(b).

Reviewed by the Court.

*Decisions will be entered for the petitioner.*

---

RAUM, *J.*, dissenting: I cannot agree that there were 20 separate trusts in this case. There was no relevant purpose other than tax avoidance for fragmenting what was essentially a single trust into a number of artificial units. Since these trusts were established by the same grantors and administered by the same trustee for the same beneficiaries, it was a matter of no consequence that there was no "commingling," a fact relied upon by the majority. Moreover, the maintenance of 10 sets of records (not 20) was but a meaningless formality, a mere "technically elegant arrangement" (*Griffiths* v. *Commissioner,* 308 U.S. 355, 357) without any substance, in view of the identity of grantors, trustee, and beneficiaries. In these circumstances, the difference between this case and the *Boyce* and *Sence* cases, which the majority opinion undertakes to distinguish, is the familiar difference between Tweedledum and Tweedledee. The facts of record herein establish that there was in truth and in substance but one trust, or at

46

most two trusts (one for each of the two primary beneficiaries). Whatever may be the proper result in a multiple-trust situation generally in the light of the impressive legislative history recounted in the majority opinion, the present case involves nothing more than a pure sham. "To hold otherwise," in the words of *Gregory* v. *Helvering*, 293 U.S. 465, 470, would indeed be "to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose."

HOYT, *J.*, agrees with this dissent.